## UNITED STATES COURT DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DANIELLE MACK, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>     v.<br><br>SIX FLAGS ENTERTAINMENT CORPORATION and SIX FLAGS GREAT ADVENTURE, LLC,<br><br>               Defendants. | Civ. No. 3:22-CV-06292 |

## DECLARATION OF BRAD MCCLAIN

I, BRAD MCCLAIN, in accordance with 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Director of Human Resources for Six Flags Great Adventure, LLC d/b/a Great Adventure ("Great Adventure" or the "Company"). I have personal knowledge of the facts set forth herein, except where otherwise indicated. I submit this declaration in support of the Motion to Dismiss of defendants Six Flags Entertainment Corporation ("SFC") and Great Adventure (together, "Defendants").

2.      I have reviewed Great Adventure's records regarding Plaintiff Danielle Mack ("Mack"). These records reflect that Mack was employed by Great Adventure from April 2021 through June 2021. During that time period, Mack worked a total of ten (10) shifts and never worked more than thirteen (13) hours per week.

3.      I additionally reviewed Great Adventures records regarding the number of hourly, non-exempt workers who were employed by Great Adventure. These records reflect that, from

the period of August 6, 2019 through the present, Great Adventure employed approximately 8,807 potential putative class members.

4.       I have reviewed Great Adventure's records regarding the home addresses of Great Adventure's non-exempt, hourly employees.  These records reflect that 8,037 out of 8,807, or 91.3%, of the non-exempt, hourly workers resided in New Jersey during their employment by Great Adventure.  Of these individuals, approximately 764 worked at Great Adventure pursuant to a work visa and resided in New Jersey while employed by Great Adventure; if these individuals are removed from the above calculation, 7,273 out of 8,043, or 90.4%, employees resided in New Jersey.

5.       Certain non-exempt, hourly workers at Great Adventure are members of and represented by the Service Trades Council Union (the "Union").  Approximately 62.2% of the non-exempt, hourly workers at Great Adventure are represented by the Union.

6.       The Union and Great Adventure have entered into successive collective bargaining agreements ("CBAs") which govern the terms and condition of employment of their employment. A copy of the CBA, dated January 1, 2018, is attached as Exhibit A.  The Union and Great Adventure have since entered into a subsequent CBA that is substantially similar to Exhibit A.

7.       The Complaint alleges that putative class members were not paid minimum wage as required by the New Jersey state law for time spent undergoing security screenings and walking to and from screenings at the Great Adventure amusement park.  No other class actions asserting the same or similar factual allegations against either SFC or Great Adventure within the three-year period preceding the filing of the Complaint.

### [*signature page follows*]

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 8, 2022.

_____
Brad McClain

# EXHIBIT A

Service Trades Union Council

# COLLECTIVE BARGAINING AGREEMENT

January 1, 2018- December 31, 2021

**INDEX-BY ARTICLE**

| DESCRIPTION | ARTICLE # | PAGE |
|---|---|---|
| PREAMBLE | 1 | 3 |
| PURPOSE | 2 | 3 |
| RECOGNITION | 3 | 3 |
| SCOPE OF AGREEMENT | 4 | 4 |
| MANAGEMENT RIGHTS | 5 | 4 |
| WORK STOPPAGES AND LOCKOUTS | 6 | 4 |
| NEW EMPLOYEE SELECTION | 7 | 6 |
| NONDISCRIMINATION | 8 | 6 |
| UNION ACTIVITY AND CHECKOFF | 9 | 6 |
| HOURS OF WORK | 10 | 9 |
| OVERTIME | 11 | 11 |
| JOB CLASSIFICATION AND WAGE RATES | 12 | 12 |
| SENIORITY AND WORK STATUS | 13 | 14 |
| LAYOFFS AND RECALLS | 14 | 17 |
| WORK ASSIGNMENTS | 15 | 18 |
| LEAVES OF ABSENCE | 16 | 19 |
| DISCIPLINE, STANDARDS OF CONDUCT AND DISCHARGE | 17 | 19 |
| GRIEVANCE PROCEDURE | 18 | 21 |
| HOLIDAYS | 19 | 22 |
| VACATION | 20 | 23 |
| JURY DUTY AND BEREAVEMENT LEAVE PAY | 21 | 25 |
| WAGES AND BENEFIT FUNDS | 22 | 25 |
| COSTUMES, UNIFORMS AND PERSONAL APPEARANCE | 23 | 26 |
| SAFETY AND HEALTH | 24 | 27 |
| WORK BY SUPERVISORS | 25 | 27 |
| EMERGENCY WORK AND RUNNING REPAIRS BY EMPLOYEES | 26 | 27 |
| BULLETIN BOARDS | 27 | 28 |
| SUBCONTRACTING | 28 | 28 |
| SICK PAY, PERSONAL DAY AND HOSPITALIZATION | 29 | 28 |
| INTERPRETATION | 30 | 29 |
| SEVERABILITY | 31 | 29 |
| MISCELLANEOUS | 32 | 30 |
| TERM OF AGREEMENT | 33 | 30 |
| ADDENDUM A | - Concessionaires Agreement | 33 |
| ADDENDUM B- 1 | - Trade Wage Rates - full-time | 34 |
| ADDENDUM B-2 | - Seasonal Warehouse (Teamster) Employees | 38 |
| ADDENDUM B-3 | - Seasonal Safari Off Road Adventure Drivers | 39 |
| ADDENDUM C-1 | - Local 54 Wage Rates – Full-Time | 40 |
| ADDENDUM C-2 | - Local 54 Wage Rates – Seasonal | 41 |
| ADDENDUM D | - Local 54 Benefit Fund Agreements | 43 |
| ADDENDUM E | - Drug and Alcohol Testing Policy | 47 |
| ADDENDUM F | - Service Trades Council Affiliate Benefit Funds | 53 |
| ADDENDUM G | - New Construction Project Labor Agreement | 55 |
| ADDENDUM H | - Local 54 Grievance Form and Procedure | 60 |
| ADDENDUM I | - Side Letters (1) Trades, (2) Local 54, (3) Trades | 63 |
| ADDENDUM J | - Local 54 Supplemental Insurance | 66 |
| ADDENDUM K | - Local 54 NRF Supplemental Agreement | 67 |
| ADDENDUM L | - Local 54 401 K Plan | 71 |
| ADDENDUM M | - Local 54 Union Tip | 74 |
| ADDENDUM N | - Teamsters Rehabilitation Agreement | 75 |

# ARTICLE 1  PREAMBLE

THIS AGREEMENT entered into this l$^{st}$ day of January, 2018, by and between SIX FLAGS GREAT ADVENTURE (hereinafter called "Company" or "SIX FLAGS GREAT ADVENTURE") and the SERVICE TRADES COUNCIL UNION on behalf of signatory Local Unions, whose names are subscribed hereto, and who have, through their duly authorized officers, executed this Agreement (hereinafter collectively called "Union").

# ARTICLE 2:  PURPOSE

WHEREAS, the operation and service of the SIX FLAGS GREAT ADVENTURE complex, as defined in Article 4, will require a large number of employees, and the orderly and uninterrupted operation of SIX FLAGS GREAT ADVENTURE is of significant interest to the economy of the State of New Jersey and of mutual interest to the parties hereto, and it is the purpose of this Agreement that all work shall proceed efficiently, without interruption, and with due consideration for the protection of labor standards, wages and working conditions; and

WHEREAS, employees have the right to organize and bargain through representatives of their own choice.

THEREFORE, the parties hereto have entered into this Agreement to recognize the Union, to establish fair wages, working conditions and benefits and to put into practice effective and binding methods for the settlement of all misunderstandings, disputes or grievances that may arise between the parties hereto, to the end that labor-management peace is maintained and employees are guaranteed union rights and protection as provided by law.

# ARTICLE 3:  RECOGNITION

**Section 3.1.** Company Recognized Service Trades Council Union. The Company recognizes the Service Trades Council Union as the sole and exclusive collective bargaining representative of all of the Company's service and maintenance employees at SIX FLAGS GREAT ADVENTURE, as defined in Article 4, but excluded are all other employees, office clericals, sales and advertising, guards, lifeguards, First aid employees, professional employees and supervisors as defined in the Labor Management Relations Act of 1947, as amended.

**Section 3.2.** Concessionaires Recognition.  The Company agrees that any concessionaire, as defined in Article 6, Section 6.4, who is engaged in any service function to the general public at SIX FLAGS GREAT ADVENTURE, as defined in Article 4, will be subject to the terms and conditions of this Agreement except as otherwise provided herein.  Except as provided in the Concessionaire's Letter Agreement between the parties dated January 1, 2018, the Company shall require Concessionaires to sign an agreement, in the form set forth in Addendum A, prior to the starting of service at SIX FLAGS GREAT ADVENTURE.

## ARTICLE 4:  SCOPE OF AGREEMENT

**Section 4.1**. Areas Included in Agreement. This Agreement relates only to all present and future entertainment attractions and/or facilities or other structures on the Company's Ocean and Monmouth County property in which the Company has a controlling interest, and concessionaires associated therewith (which herein are referred to as the "Complex"), but excludes any other enterprises that may be located on the Company's Ocean County or Monmouth County property, such as hotels and/or restaurants.  For purposes of this provision, controlling interest shall mean a corporation in which the Company or a majority owned subsidiary has the right to designate at least a majority of the Board of Directors or a limited partnership which the Company has the right to designate at least a majority of the Board of Directors of the managing general partner, or a general partnership in which the Company has the right to designate at least a majority of any governing body in each case as provided in the constituent documents of that company (including partnership agreements and stockholder arrangements).  A majority owned subsidiary shall be defined as a subsidiary in which the Company has a right to designate at least a majority of the Board of Directors.  This Agreement shall not apply to employees of electric and gas utilities and telephone companies.

## ARTICLE 5:  MANAGEMENT RIGHTS

Except as expressly and clearly abridged, delegated, granted or modified by the terms of this Agreement, the Company reserves and retains exclusively all of its normal and inherent rights, powers and authorities with respect to the management of the business, including but not limited to, its right to determine and from time to time re-determine the number, location and type of operation, and the methods, processes and materials to be employed in maintaining the operation; to institute technological changes and to change, alter, substitute, replace, add to or eliminate equipment, processes or procedures; to discontinue, temporarily or permanently, and in whole or in part, the conduct of its business or operation; to determine the sources of materials and supplies; to select, train, assign and direct the working force in accordance with the requirements determined by management; to determine, and from time to time redetermine, the number and classes of employees to be employed and the number of employees to be assigned to any particular classification of work; to lay off, terminate or otherwise release employees from duty for lack of work or other just cause; to establish jobs or readjust or eliminate existing jobs; to establish and change work schedules or work assignments; to hire, train and supervise the working force; to make and enforce Company rules governing the conduct of the working forces and the personal grooming and maintenance of discipline; to subcontract work; and otherwise to take such measures as management may determine to be necessary to bring about the orderly, efficient and economical operation of business.

## ARTICLE 6:  WORK STOPPAGES AND LOCKOUTS

**Section 6.1.** No Strike-No Lockout. During the existence of this Agreement, there shall be no strikes, picketing, work stoppages, slowdowns, or any other disruptive activity or interference of any kind or interruption of work by the Union or by any employee and there shall be no lockout by the Company.

**Section 6.2.** Failure to Cross Picket Line - Violation of Agreement. Failure of any employee covered by this Agreement to cross any picket line established at or around the Complex or at any operations or enterprises on park property that are not within the scope of this Agreement,

4

is a violation of this Agreement, except where reasonable effort to gain entry has been made and the employee has been threatened with property damage or great bodily harm.

**Section 6.3.** Union's Responsibility to Prevent Work Stoppage, Strike or Disruptive Activity. The Union shall not sanction, aid or abet, encourage or condone a work stoppage, strike, picketing, slowdown, or any other disruptive activity or interference of any kind or interruption of work at or around the Complex or at any operations or enterprises on park property that are not within the scope of this Agreement, and shall undertake all possible steps to prevent or to terminate any such strike, work stoppage, picketing, slowdown, or any other disruptive activity or interference of any kind or interruption of work. No employee shall engage in activities that violate this Article. Any employee who participates in or encourages any activities, which interfere with the normal operation of the SIX FLAGS GREAT ADVENTURE Complex or any operations or enterprises not included within the scope of this Agreement, shall be subject to disciplinary action, including discharge. The Union shall not be liable for acts of employees for which it has no responsibility. The failure of the Company to exercise this right in any instance shall not be deemed a waiver of this right in any other instances, nor shall the Company's right to discipline all employees for any other cause be in any way affected by this Section.

**Section 6.4.** Disputes With Concessionaires. Disputes between the Unions signatory hereto and any concessionaire operating at SIX FLAGS GREAT ADVENTURE shall be handled as to not interfere with the Company's business or the business of any concessionaire not a party to such disputes. No picketing or concerted action against any one or more of the concessionaires will be conducted at or around the Complex, including without limitation near or around any entrance or exit of the SIX FLAGS GREAT ADVENTURE Complex, or at any operations or enterprises on park property that are not included within the scope of this Agreement. "Concessionaire" as used herein, includes a concessionaire and also a licensee, contractor, subcontractor or lessee. In the event any other organization pickets at or near the SIX FLAGS GREAT ADVENTURE Complex or at any operations or enterprises on park property that are not included within the scope of this Agreement, the Unions signatory hereto agree that such picket line so far as they and the employees they represent are concerned shall not affect the operation of the Company or concessionaires who are not involved in the dispute.

**Section 6.5.** Expedited Arbitration For Article 6. Any party to this Agreement may institute the following procedure in lieu of or in addition to any other action at law or equity, when a breach of this Article is alleged.

**(a)** The party invoking this procedure shall notify the American Arbitration Association, which shall submit a panel of five (5) arbitrators within twenty-four (24) hours from which one will be selected to serve as Arbitrator. The parties shall select an arbitrator from such list within twenty-four (24) hours. Notice to the Arbitrator shall be by the most expeditious means available, with a notice by facsimile or by hand delivery to the Business Manager of the Union alleged to be in violation of the Agreement.

**(b)** Upon receipt of said notice, the Arbitrator named above or his/her alternate shall set and hold a hearing within twenty-four (24) hours.

**(c)** The Arbitrator shall notify the parties by facsimile or by hand delivery of the place and time he has chosen for this hearing. Said hearing shall be completed in one session, with appropriate recesses at the Arbitrator's discretion. A failure of any party or parties to attend said hearing shall not delay the hearing of evidence or issuance of any Award by the Arbitrator.

**(d)** The sole issue at the hearing shall be whether or not a violation of this Article has in fact occurred and the Arbitrator shall have no authority to consider any matter in justification, explanation or mitigation of such violation or to award damages which issue is reserved for court proceedings, if any.  The Award will be issued in writing within three (3) hours after the close of the hearing, and may be issued without any opinion.  If any party desires an opinion, one shall be issued within fifteen (15) days, but its issuance shall not delay compliance with, or enforcement of the Award.  The Arbitrator may order cessation of the violation of this Article and other appropriate relief, and such Award shall be served on all parties by hand or registered mail upon issuance.

**(e)** Such award may be enforced by any court of competent jurisdiction upon filing of this Agreement and all other relevant documents referred to hereinabove.  Notice by facsimile or hand delivery of the filing of such enforcement proceedings shall be given to the other party. In the proceeding to obtain a temporary order enforcing the Arbitrator's award at issue under Section 6.5(d) of this Article, all parties waive the right to a hearing and agree that such proceeding may be ex parte.  Such Agreement does not waive any party's rights to participate in a hearing for a final Order of Enforcement.  The court's order or orders enforcing the Arbitrator's Award shall be served on all parties by hand or by delivery to the last known address or by registered mail.

**(f)** Any rights created by statute or law governing arbitration proceedings inconsistent with the above procedure, or which interferes with compliance thereof, are hereby waived by the parties to whom they accrue.

**(g)** The fees and expenses of the Arbitrator shall be divided equally between the moving party or parties and the party or parties' respondent.

## ARTICLE 7: NEW EMPLOYEE SELECTION

The Company agrees to notify the Union by telephone of its need for employees and will provide the Union with an opportunity to provide applicants for such jobs.  The Union will refer applicants to the Company on a non-discriminatory basis.

## ARTICLE 8: NONDISCRIMINATION

The Company and the Union agree there shall be no discrimination against any employee or prospective employee as required by federal and state legislation.

## ARTICLE 9: UNION ACTIVITY AND CHECKOFF

**Section 9.1**. Union Solicitation. Solicitation for Union purposes by the Union shall not take place on working time, in working areas, in public areas, but may be conducted in nonworking areas and on nonworking time, in the employee parking areas, break areas and lunch room. The Company agrees that Local "54" authorization forms and Teamsters Seasonal Safari Off Road Adventure Drivers authorization forms shall be issued to all employees at the same time they execute all other employment forms necessary to make them active on payroll.

**Section 9.2.** Access of Union Representatives to Premises. Representatives of the signatory unions, designated in writing to the Company by the Union, shall be permitted to enter SIX FLAGS GREAT ADVENTURE for the purpose of determining that this Agreement is being complied with by the Company and for the presentation and handling of grievances.  Such

representatives, who shall not be more than a total of five (5) in number at any one time, allocated proportionately by the Union based upon the number of employees serviced by each local union, notice of which allocation shall be given the Company, shall comply with the access regulation and security regulation of the Company, as furnished to each union representative by the Company, and shall not interrupt the performance of employee work assignments. Any such representative shall provide the Company with notice prior to entering SIX FLAGS GREAT ADVENTURE in accordance with this Section 2 and shall use the Service Entrance Gate when entering SIX FLAGS GREAT ADVENTURE.

**Section 9.3.** Shop Steward Or Alternate.

**(a)** The Union shall have the right to designate shop stewards in a number mutually agreed upon by the parties. The number of shop stewards may be changed by mutual agreement of the parties. The Local Union shall, in writing, notify the Labor Relation's Office of the Company as to the identity of the designated shop steward. The shop steward shall have the right to receive, but not to promote, complaints or differences and to discuss and assist in the adjustment of the same with the appropriate supervisor (as provided in Article 18, "Grievance Procedure" and Article 17, "Discipline, Standards of Conduct and Discharge"). The Company will not discriminate against the shop steward in the proper performance of his/her union duties provided that such duties do not unreasonably interfere with the shop steward's regular work or with the work of other employees, and the shop steward shall not leave his/her work station without first notifying his/her appropriate supervisor as to his/her intent, the reason therefore, where he/she can be reached and the estimated time he/she will be gone. Super seniority shall be accorded shop stewards in cases of layoffs only.

**(b)** Where the complaint or difference involves more than one (1) employee, it must be presented to management by the shop steward alone for the employees involved unless presented outside of regular working hours, or unless the Division Vice-President or park manager involved gives permission for other employees to attend such presentation.

**(c)** The Company agrees upon discharge of any employee, other than a seasonal employee, to promptly notify the shop steward of the discharge and the reasons for the discharge. In case the shop steward is not available, the Company will notify the alternate shop steward or the Union office in the event of the layoff or discharge of a shop steward in advance of the termination, if possible.

**(d)** A shop steward or alternate will accompany representatives of management whenever locker or automobile trunk inspections are made.

**(e)** Seasonal shop stewards will be selected by the Union from second or third year employees when available, from different areas at SIX FLAGS GREAT ADVENTURE. The seasonal shop stewards will perform the following duties:

**(i)**       Shop stewards will hand out copies of the seasonal contract upon request;

**(ii)**      If a grievance is presented to them, they will take the grievance down and report back to the Union office; at no time will any grievance be taken during working time of the grieved person. These grievances will primarily be taken during the employee's break time or lunch break.

(iii)     Shop stewards will not attempt to adjust grievances with department managers.  This will be handled by the Union Business Agent.

**Section 9.4.** Check off. Effective with the next payroll period after receipt of an authorization form, the Company agrees to withhold from the wages on each payroll week uniform weekly membership dues and initiation fees for each employee, full-time and seasonal, who signs and submits an authorization form.  The Company shall forward such dues to the certified financial secretary or other properly designated official of the union, as follows:

**(a)** Trades: According to practice as determined by Local and International practice; for Trades having deductions from wages for a designated vacation fund, signed authorization forms will be provided authorizing check off in an amount indicated and made payable to the appropriately designated fund.

**(b)** Local 54: On or before the third week following the last week in the month in which the dues are deducted.

The Company shall deduct from an employee's wages only that amount which the certified financial secretary or other properly designated official of the Union has certified to the Company in writing is the amount of dues in accordance with applicable law and such Union's By-laws and Constitution.  The Union agrees to indemnify and save the Company harmless against any and all claims, suits or other forms of liability arising out of the deduction of money for union dues from employee's pay.  The Union assumes full responsibility for the disposition of the monies so deducted once they have been turned over to the certified financial secretary or other properly designated official of the Union.

**Section 9.5.** Union Security. It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union in good standing on the date this Agreement is signed, shall remain members in good standing and those who are not members on the date this Agreement is signed, shall on the 30th day following the date this Agreement is signed, become and remain members in good standing in the Union.  It shall also be a condition of employment that all employees covered by this Agreement and hired on or after the date this Agreement is signed, shall on the 30th day following the beginning of such employment, become and remain members in good standing in the Union.  In the event that any employee fails to comply with the requirements of this Section, the Company shall discharge said employee within seven (7) days of receipt of a written demand from the Union. The Union agrees to indemnify and save the Company harmless against any and all claims, suits or other forms of liability arising from any actions taken by the Company consistent with this Section 9.5.

**Section 9.6.** Seasonal Permit Fee. It is further agreed that the Company shall deduct from the wages of all seasonal employees upon written authorization from the employee effected, seasonal permit fees levied by the Union but not to exceed the amount of the regular monthly dues required to be paid by all regular members.  The Union agrees to indemnify and save the Company harmless against any and all claims, suits or other forms of liability arising out of the deduction of seasonal permit fees levied by the Union.  Local 54 members who are temporary workers employed thirty (30) calendar days or more shall pay the permit fee. Returning Seasonal employees will have work permit fee's deducted upon their return to work.   The Union may request a review of the work records of the Company's employees.  This review shall take place on or about the fifteenth (15th) day of the month in which the review is requested.

**Section 9.7.** The Employer shall furnish LOCAL 54 and the Teamsters with a quarterly list of all employees in the bargaining unit, including each employee's name, social security number, department, classification, home address, rate of pay, phone, status (full time or Seasonal), date of birth, date of hire and sex.  This report shall be in computer-readable format in any one of the following media containing header information and a field record layout:

(a)       Scanned PDF
(b)       CD ROM in Formatted Text (Space Delimited format
(c)       ZIP Disk in Formatted Text (Space Delimited) format
(d)       Via e-mail transmission: smuniz@uniteherelocal54.com
(e)       Fax

## ARTICLE 10: HOURS OF WORK

**Section 10.1.** Payroll Week.  A payroll week is a period of seven (7) days starting at 0001 on each Monday and ending at 2400 midnight on the Sunday in the following week.

**Section 10.2.** Payroll Day.  A payroll day is a period of twenty-four (24) hours starting at 0001 and ending at 2400 hours the same day.

**Section 10.3**. Workweek.

**(a) Trades:** Except as otherwise provided in this Article 10, the regularly scheduled workweek for full-time employees and for seasonal employees shall consist of five (5) days in a seven (7) day period starting at 0001 each Monday and ending at 2400 hours on Sunday in the following week.  All full-time employees shall be scheduled for a minimum of forty (40) hours per week.  In addition to the parties' agreement as set forth in Article 15, the parties agree that full-time sheet metal, masonry, fiberglass and operating engineer (equipment operator) employees shall receive the aforementioned forty (40) hour per week guarantee provided said employees perform work outside their particular craft or regular assignment, as directed by the Company.

**(b)** The following additional terms are applicable to "Local 54" members:

  **(i)** Except as otherwise provided in this Article 10, all full-time Local 54 personnel shall, during the season and when the Park is operating on a continuous, full-time basis, receive a guarantee of eight (8) hours per day on a five (5) day per week basis or a guarantee of ten (10) hours per day on a four (4) day per week basis, as applicable**.**

  **(ii)** The daily guarantees of full-time Local 54 personnel shall not be applicable in cases of inclement weather, emergencies, acts of God or labor disputes when such factors result in the Park closing, or operations curtailed to the point of having to send some employees home early.  It is specifically agreed that the term "inclement weather" includes rain and/or cold temperatures, but that it is not limited to these factors alone.  When such conditions occur, the employees will receive not less than the basic call-in pay if the employee has not been notified not to report or for the actual hours worked, whichever is greater.  At no time will a full-time employee be sent home as long as there is a seasonal employee working, provided the full-time employee has not requested to be sent home.

**(c)** Work schedules shall be communicated to affected employees at least one (1) week in advance, except that in case of emergency or absenteeism, schedule changes shall be communicated to the affected employee promptly.

**(d)** Notwithstanding the provisions of Article 10, Section 10.3, the Company may establish for any or all Local 54 full-time personnel, on a temporary or permanent basis, a work week of four (4) days in a seven day period, with each day consisting of not less than ten (10) hours; provided, however, that no employee who is scheduled to work a four-day work week for two (2) consecutive weeks shall be scheduled to work for eight (8) consecutive days; provided, further, that an employee who is-scheduled to work a four-day work week under this subsection shall receive three (3) consecutive days off during such four-day work week.

**(e)** Except as otherwise provided in Subsection 10.3 (b)(ii) of this Section, full-time employees shall not be required to leave work early.  If an employee voluntarily leaves early, he shall be paid for the hours actually worked.

**(f)**   During the Shoulder Months (the time period outside of Memorial Day through Labor Day), the Company may, provided that it has previously offered the time to all full-time Teamster represented employees and the ten (10) individuals then included in the seasonal Teamster represented employee roster, employ employees on a weekend only basis.

**Section 10.4.**  Reporting Pay for Full time Local 54 Members, and Seasonal Local 54, and Seasonal Safari Off Road Adventure Drivers:
**(a)** Full Time: A regularly scheduled workday for Local 54 full time employees shall consist of a minimum of four (4) hours.  All full-time Local 54 employees who work more than four (4) hours, but less than eight (8) hours shall receive eight (8) hours pay.

**(b)** Seasonal: A regular scheduled workday for Seasonal employees shall consist of a minimum of two (2) hours.

**Section 10.5.** Work Schedule.

**(a)**   Unless required to deviate for reasons of dependability, skills, abilities and experience of employees and/or for the orderly and uninterrupted operation of the Company, and except as otherwise provided in Article 10, Section 10.3(d), the Company shall adhere to seniority in establishing work schedules in a department or location for all employees.  The determination of an employee's dependability, skills, abilities and experience shall be made by the Company. Any dispute arising under this Section shall be subject to the grievance procedure.  A full-time employee will be assigned any combination of two (2) or three (3) days off (in a four-day work schedule) within a seven (7) day period except during the operating season, which commences eight (8) weeks prior to Park opening and ends two (2) weeks after the Park closes and, in addition shall include any period of time during which the Park is open for special events, including the time to prepare the Park to be open for such special events.  During the operating season, the schedule will be prepared by the Company on a weekly basis or as the exigencies of business demand.  Except in the case of an emergency, an employee will be notified of any change in such assignment as soon as practicable in advance of the change.

**(b)**   Seasonal "Local 54" employees and Seasonal Safari Off Road Adventure Drivers will be scheduled by the Company as necessary, subject to weather changes, at a minimum of six (6) hours per day when scheduled to work.  The parties may mutually agree on the appropriate scheduling of any person who cannot or does not wish to work a minimum six hour day in accordance with this subsection.  Nothing in this subsection shall be construed as a guaranteed workday; when the needs of business require that seasonal employees be sent home, they shall

be sent home in reverse order of seniority in their department, classification and station, and shall be paid for hours actually worked.

**Section 10.6**. Meal Period, Dress and Travel Time.  All full-time employees shall be scheduled for a 45 minute meal break of which fifteen (15) minutes shall be paid dress and travel time and thirty (30) minutes shall be unpaid.  No employee shall be required to work more than five (5) hours without a meal break, except in the event of a business necessity. All seasonal employees will be scheduled for a 45 minute unpaid meal break.  Not-withstanding the other provisions of this Section, Characters on grounds shall receive one (1) thirty (30) minute unpaid meal period and three (3) paid breaks of fifteen (15) minutes each per shift.  Characters (show operations) may require additional breaks depending upon weather conditions.

**Section 10.7**. Break Period. The Company shall schedule one ten (10) minute work break during the first four (4) hours of each shift for all full-time employees. The time of the break shall be at the Company's convenience and may vary by department and shift.  All breaks must be taken at the job site where the employee is assigned at the time of the break.

**Section 10.8**.  **Reporting Pay**: **Trades/Full Time Local 54 & Teamsters**

**(a)**      If conditions beyond the control of the Company such as, but not limited to, fire, flood, blizzard, hurricane, or other Act of God, civil disturbances, picketing and threats of harm force the administration offices to close for the day and or remain closed, all Full Time "Scheduled" employees affected by this will be paid their "Scheduled" hours. Maintenance management will notify the shop stewards for each trade two (2) hours prior to the start of the day. The shop steward will then notify the members of their trade that they should not report for their shift for that day. Essential personnel will be called to come in for the day. Essential personnel that work when the office is closed will receive a $75.00 gift card once a year.

**(b)**      No pay will be due an employee if due to conditions beyond the control of the Company such as, but not limited to, fire, flood, blizzard, hurricane, or other Act of God, civil disturbances, picketing and threats of harm, an employee chooses not to report for work after being notified the administration offices will open/remain open for business.

## ARTICLE 11: OVERTIME

**Section 11.1.** Management Responsibility. It shall be the responsibility of management to determine in each instance if overtime work is required, and if so, how many employees will be required to perform the work.  Overtime work will not be recognized unless first authorized by the Company.

**Section 11.2.** Division of Overtime Work: For Trades- Overtime work shall be distributed as equitably as is reasonably practical among full-time and supplemental employees in each job classification in the area normally engaged in the work involved. Notwithstanding the foregoing, it is expressly agreed and understood that in those situations where unscheduled overtime work is to be performed that is of a specialized nature requiring more than ordinary skill to complete or is work during a ride breakdown in which guest or employees are involved the employee on the job or the most qualified employee will be assigned the overtime work. In the Safari Park, the needs of the animals may necessitate Company discretion.

**Section 11.3.** <u>Time and One-Half.</u> All employees shall be paid one and one-half (1-1/2) their regular straight time hourly rate for all hours worked in excess of forty (40) hours in any one payroll week.  Additionally, Trades employees shall receive overtime pay for all hours worked in excess of eight (8) any day. Local 54 full time employees will receive time and a half (1 ½) for all work over 10 hours in any work day.

**Section 11.4.** <u>Overtime Work Requirement</u>: <u>For Local 54 and Teamsters members-</u> In the event the Company requires overtime work to be performed on a scheduled work day within a Department, the Company may require employees in that Department who are working that day to perform overtime work in reverse order of seniority within the Department for up to four (4) hours, and any affected employees shall not refuse to perform overtime work.  In the event the Company requires overtime work to be performed by employees who are not scheduled to work that day, the Company may require such employees to perform overtime work in reverse order of seniority within the Department up to a maximum of twelve (12) hours, and any affected employees shall not refuse to perform overtime work; provided that the Company shall provide affected employees no less than forty eight (48) hours notice. Reverse order of seniority is defined as offering the most senior employees the work and forcing the least senior, if the more senior employees decline.

**Section 11.5.** <u>No Pyramiding of Premium Rates.</u> Where two or more premium rates apply to the same hour of work, the higher will be paid, and there will be no pyramiding of any premium rates.

**Section 11.6**. <u>Utilization of Building Trades Employees</u>. During the period outside the operating season, as defined in Article 10, Section 10.5, Saturday and Sunday work shall be considered premium time notwithstanding that an employee may not work on such day because of paid holiday, or other personal day provided in Article 19 Section 19.2 of this Agreement.

**Section 11.7**.  <u>No Overtime for Seasonal Local 54 Employees</u>.  Notwithstanding any other provisions of this Agreement, Seasonal Local 54 employees are exempt from receiving overtime pay in accordance with state and federal laws.  The Company will provide the Union of all approvals from the State of New Jersey on a timely manner.  However, those Seasonal employees in Landscape and Safari who work in the off-season (winter) will continue to receive overtime pay at one and one-half times (1 ½ ) their straight time hourly rate of pay for all hours worked in excess of forty (40) hours in any one payroll week.  In addition pursuant to State and Federal regulations, Retail and Food Service Team Members will receive overtime at time and one-half (1 ½) for all hours worked over 40 hours in any one payroll period. The Employer agrees to follow all State and Federal regulations.

## ARTICLE 12: JOB CLASSIFICATION AND WAGE RATES

**Section 12.1**. <u>Job Classification.</u>

**(a)**  The Company shall, in its maintenance department, utilize persons referred by Ocean and Monmouth Counties Building Trades Council to perform work which the Company deems necessary to be performed.  If the Union cannot provide qualified persons for a position within forty-eight (48) hours or if the Company has been supplied with Union personnel that it deemed unqualified on three occasions, then the Company may hire directly to fill the requested position.  "Maintenance" means maintenance repair, servicing, renovation, and reconstruction of existing structures, operations and facilities.

**(b)**  All other classifications covered by this Agreement and not excluded under Article 3 or 4 of this Agreement or represented under other labor organizations shall fall under the jurisdiction of "Local 54."

**Section 12.2**. Schedule of Wage Rates. The job classifications and rates of pay which shall prevail during the term of this Agreement are set forth for the Trades in Addendum B-1, B-2, B-3 and for Local 54 in Addendum C-1 and C-2, each of which is attached hereto and considered in all respect, to be a part of this Agreement.

**Section 12.3**. Rates for New Jobs. If the Company hereafter establishes any new or substantially changed job classifications or work operation, it will give as much notice thereof to the Union as is possible, and will discuss same if requested. The new job classification and wage rate for such new job classification will be established by the Company.  If the Union does not agree with the rate for the job classification, the Union shall submit a written grievance.  In the event any higher rate is agreed upon through the grievance procedure or arbitration, it shall be effective retroactively as of the date the job classification was installed. It is agreed that by directing employees to cross craft lines in accordance with Article 15, the Company shall not be deemed to have created a new or substantially changed classification or work operation within the meaning of this Section and, accordingly, no new wage rate shall be created.

**Section 12.4**. Pay For Day When Injured. In the event an employee incurs a serious occupational illness or injury and the medical department excuses the employee from further work on that day, he shall be paid the un-worked balance of his regularly scheduled shift.  Pay for the un-worked balance of his shift due to an occupational injury shall be considered as time worked for purposes of computing overtime.

**Section 12.5.** Payday. Employees shall be paid weekly and their pay will not be delayed more than six (6) days from the end of each payroll period, provided however, that if a payday falls on an employee's regularly scheduled day off or a paid holiday, he shall receive his paycheck on his next regularly scheduled workday, except as provided in Article 17, Section 17.4 of this Agreement.

**Section 12.6.** Leads.
**(a)** Leads shall be designated by the Company in any of the classifications set forth in Addendum B-1, provided such classifications have 3 or more full-time employees.  Leads may be designated by the Company in any of the classifications set forth in Addenda C-1 and C-2. Leads in any of the classifications in Addendum B-1 shall be paid in accordance with Addendum B-1.  A lead is an employee who trains other employees, provides leadership and direction to employees in the group, operation, or function, while performing the same duties as the employees.  Duties shall include, but are not limited to, promoting teamwork and assisting the team with meeting quality and quantity standards.  They are not responsible for personnel actions such as hiring, terminations, transfers, and upgrading or disciplinary measures or for the testing and certification of other employees.  The Company may change leads or re-designate leads to their normal job classification.  For purposes of title only, leads in any of the classifications in Addendum B-1 shall be called "lead/foreman."

**(b)** In filling full-time lead positions, the Company will give due consideration to seniority, provided the employee possesses the necessary skills, qualifications, ability, dependability, and initiative.  Factors unrelated to the foregoing are specifically prohibited from the Company's evaluation for assignment to a lead position.

**(c)** Any dispute regarding the administration of this provision shall be subject to the grievance procedure.  If a grievance is filed, the Company will respond in writing why the successful employee was selected.

**(d)** If the Company uses a full-time employee to act as lead during the operating season over seasonal employees, said full-time employee shall receive fifty cents ($.50) per hour above the contractual rate of pay for the time worked.  At the conclusion of their assignment as a lead, employees shall revert back to their regular full-time rate.

**Section 12.7**. Removal of Light Bulbs.

Local 400 will supply bulbers at a forty percent (40%) discounted rate and the Company will agree to utilize such personnel during the operating season for the replacement of bulbs within the park.  The Company has the right to utilize existing non-Local 400 personnel to rebulb specific locations limited to ten (10) bulbs per day and no more than ten percent (10%) of total bulbs at a specific location.

**Section 12.8.** Safari Utility Person.

The Company agrees to hire and employ two (2) additional Union personnel to work exclusively in the safari complex of the park, provided that the number of bargaining unit employees represented by each trade will not fall below the number of such employees employed as of July 1, 2002.  The duties of these personnel shall include routine maintenance on the safari complex, i.e., building maintenance, general grounds maintenance.

## ARTICLE 13: SENIORITY AND WORK STATUS

**Section 13.1**. Definition of Seniority. Seniority is defined as the period of continuous service with the Company since the last day of hire.  If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior. Seniority shall apply to full-time employees only, except that seasonal employees shall have seniority rights with regard to the provisions of Article 10, Section 10.5 of this Agreement. Seasonal employees who become full-time shall have as their seniority date their first date of hire unless such employee's employment was interrupted by termination or by a layoff of more than three (3) months.

**Section 13.2**. Principles of Seniority. The principles of seniority shall be observed in layoffs and recalls provided the employee possesses the necessary skills, qualifications, and ability to perform the available work without additional training as determined by the Company.

**Section 13.3.** Dispute On Seniority To Grievance Procedure. Any dispute on the application of the seniority principle shall be subject to the grievance procedure.

**Section 13.4.** Termination of Seniority. Seniority and the employment relationship shall terminate when an employee:

**(a)** Resigns;

**(b)** Is discharged for just cause;

14

**(c)** If full-time, is absent for three (3) consecutive unexcused workdays; if supplemental maintenance or seasonal, is absent for two (2) consecutive unexcused workdays;

**(d)** Is laid off for a continuous period of six (6) months or more; or

**(e)** Fails to report at the end of a leave of absence.

**Section 13.5.** Work Status. The status of all employees will be in accordance with the following categories, which are defined below and used throughout the Agreement:

**(a)** Full-time employee. A full-time employee is one who is assigned to a year round position at the Company who works in the classifications set forth in Addenda B-1, and C-1, or in the case of the Teamsters as set forth in Addendum B-2, paragraph D. Under no circumstances shall full-time employees receive any rate of pay other than the rates set forth in Addenda B-1 and C-1. The Company agrees to employ at a minimum, one (1) person per trade.

**(b)** Probationary employee. All new hires for positions as full-time employees in the classification in Addendum B-1 shall be considered probationary employees for a period of sixty (60) calendar days. All new hires for positions as full-time employees in the classification in Addendum C-1 shall be considered probationary employees for a period of ninety (90) calendar days. The Company reserves the right to terminate their employment for any reason until they have completed such probationary period. However, probationary employees shall be entitled to utilize the grievance procedure to grieve any matter, which could be grieved by any other employee except termination within the probationary period of sixty (60) or ninety (90) days, as applicable.

**(c)** Supplemental Maintenance Employees. Employees who are hired to supplement the Company's regular full-time maintenance employees and who are performing work in the Trades' classifications, shall be paid in accordance with Addendum B-1 provided, however, that if said supplemental maintenance employees work fifteen (15) or fewer days, they shall be paid in accordance with Article 13, subsection d, and shall be subject to the Addendum G. Unless such employees work in excess of forty-five (45) calendar days and meet all other criteria set forth in the appropriate Articles, the following Articles of the Agreement shall not be applicable to supplemental maintenance employees: 13 (except for Section 13.5, which is applicable), 16, 21 and 22. Any supplemental maintenance employee who has been on the active payroll one hundred eighty (180) days or more, and who is recalled within five hundred and forty (540) days of his/her last regularly scheduled day, shall be exempt from the forty-five (45) calendar day restriction for such season. The Company may, at any time, designate supplemental maintenance employees as full-time employees based upon the Company's assessment of the skills, ability, dependability, initiative, and seniority of such employee. Upon designation by the Company of a supplemental maintenance employee as a full-time employee, the Company shall notify in writing the local union representing such supplemental maintenance employee.

**(d)** New Construction Employees. Employees who are hired to perform new construction at the Complex shall be subject to the terms and conditions of employment set forth in the applicable Project Labor Agreements between the parties, which are set forth in Addenda G, and as follows:

Addenda G - New Construction Project Labor Agreement Employees who are hired to perform new construction at the Complex shall be subject to the terms and conditions set forth in the Project Labor Agreement between the parties set forth in Addendum G pursuant to which New Construction Employees shall be paid ninety percent (90%) of the then current outside construction rate of their respective Trade plus one hundred percent (100%) of the then other current outside benefit package of their respective Trade; provided, however, that employees who are hired by specialty contractors who handle such new construction work (including contractors who handle scenic painting, artistic theming design, and artistic rock work and foam) shall be subject to the terms and conditions set forth in the Project Labor Agreement between the parties set forth in Addendum G (site agreement only). Any work starting after 2:30pm will be considered the second shift, and the contractor will pay (95%) of the outside wage rate and (100%) of benefits for new construction for second shift. Maintenance personnel will be paid ninety (90%) of outside wage and one hundred (100%) of the outside benefit rate when work is required for the first or second shift on new construction projects.

**(e)** Seasonal Employee. Seasonal employee is defined as one who is hired in the classifications listed in Addenda B-2, B-3 and C-2 and who works within the specifications of Section 6 of this Article 13. The following Articles of the Agreement shall not be applicable to seasonal employees: 11.3, 13 (except for Section 13.5(e), 13.6, and 13.7, which is applicable), 16, 19, 20, 21, 22, and 29.

**1)**    All Local 54 seasonal employees who complete their last regularly scheduled day in a season shall be eligible for rehire the following season, provided such employee's performance was acceptable and further, provided said employee has been active on the payroll ninety (90) days or more in the previous season, provided, however, that the Company is not required to place seasonal employees in the same classification and department as in the previous season. The rate of pay for all returning seasonal employees shall be increased by the following amounts based on their longevity with the Company:

| Consecutive Seasons | Total increased Amount |  |
|---|---|---|
|  | 2018 thru 2021 |  |
| 2 seasons | $.15 | per hour added to his/her Hire Rate |
| 3 seasons | $.25 | per hour added to his/her Hire Rate |
| 4 seasons | $.35 | per hour added to his/her Hire Rate |
| 5 seasons | $.45 | per hour added to his/her Hire Rate |
| 6 – 10 seasons | $.50 | per hour added to his/her Hire Rate |
| 11-15 seasons | $.55 | per hour added to his/her Hire Rate |
| 16-20 seasons | $.60 | per hour added to his/her Hire Rate |
| 21 | $.70 | per hour added to his/her Hire Rate |

There will be no reduction in pay under any circumstance for longevity/consecutive seasons of work, however, no seasonal employee shall suffer a reduction in their rate of pay on account of the Company placing the seasonal employee in a different job classification or department unless:

**1)** Transfers requested by the Team Member,

**2)** Transfers due to Safety Violations where termination is not warranted,

**3)** Transfers due to Cash Handling Policy Violations where termination is not warranted,

16

**4)** Transfers due to policy violations where termination is not warranted,

**5)** Rehire employees requesting transfers to another department at the beginning, or throughout the season,

**6)** Elimination of positions by the company, and the employee is not qualified to fill an equivalent position at the eliminated rate,

**7)** Departments fully staffed at the time the rehire employee decides to re-apply for their previous position.

Notwithstanding the above, those seasonal employees working consecutive seasons for 21 or more consecutive seasons shall continue to receive fifteen cents ($.15) per hour increase for each year of consecutive service.

**(2)** Seasonal employees who are classified as warehousemen who return to work the following year and who have completed ninety (90) or more days of continuous service in the previous season shall return at the same rate of pay as at the end of the previous season, but after ninety (90) days of continuous service in the second or returning season, shall then be paid in accordance with Addendum B-2.

**Section 13.6**. Use of Seasonal Employees. Seasonal employees may be used from eight (8) weeks before the Park opens until four (4) weeks after the Park closes.  In addition, the Company may use seasonal employees at any other time upon the mutual agreement of the Company and Local 54 for Local 54 Seasonal employees and Teamsters for Seasonal Safari Off Road Adventure Drivers; Local 54's and the Teamster's for the Seasonal Safari Off Road Adventure Drivers agreement shall not be unreasonably withheld.  Should the Company operate other than on a seasonal basis, the Union's shall be notified as to the Company's schedule.

**Section 13.7.** Seniority. The principles of seniority shall be observed in layoffs and recalls of seasonal Local 54 employees and Teamsters Seasonal Safari Off Road Adventure Drivers, provided the employee possesses the necessary skills, qualifications and ability to perform the available work without additional training as determined by the Company.

## ARTICLE 14: LAYOFFS AND RECALLS

**Section 14.1**. Layoff According to Seniority In Job Classification. Whenever in the Company's business judgments it becomes necessary to reduce the working force in a given job classification, the full-time employee(s) assigned to that job classification with the least Company wide experience will be laid off providing the remaining employees possess the necessary skills, qualifications and abilities to perform available work as determined by the Company.

**Section 14.2**. Notice of Layoff. Whenever possible, one week's advance notice of layoff will be given to full-time employees.  It is further mutually agreed that no penalty shall accrue to the Company in the event of failure on the part of the Company to provide said one-week's advance notice.  The Company will furnish to the Unions written notice of new hires and layoffs.

**Section 14.3.** Recall Procedure. If the Company determines to fill a vacancy in a given job classification from which employees are laid off, such employees will be recalled in the reverse order of layoff for that job classification.  The Company will forward notice of recall by certified mail to the address of the laid off employee on record with the Company, and to the

applicable Local Union, mailed at least four (4) days prior to the date on which the laid off employee is required to report. The Company shall, four (4) days prior to the report date, telephone the Union regarding its desire to recall a laid off employee. A copy of any such written notice shall be mailed to the Union.

**Section 14.4**. Correct Address And Telephone Number. Failure of an employee to have a current address and telephone number on record in the Personnel Department will relieve the Company of its responsibility of notification to the employee under any Article of this Agreement.

**Section 14.5.** Failure to Report From Layoff. An employee who fails to report for work as scheduled on recall from layoff shall be considered to have voluntarily terminated his/her employment, unless such employee has notified the Company of personal illness or a death in the immediate family, prior to the date the employee was scheduled to report to work.

**Section 14.6.** Seasonal Employees. The terms and provisions of this Article shall not be applicable to seasonal employees.

## ARTICLE 15: WORK ASSIGNMENTS

**Section 15.1.** Assignment of Work. The Company shall assign employees as it deems appropriate, provided such assignments do not endanger the safety of employees and provided such assignments shall be made to Trades' employees in accord with their primary jurisdiction as currently practiced at the Complex. To promote the efficient operation of the Park, the Company and Union agree that employees may be assigned maintenance work (defined to mean maintenance repair, servicing, renovation, and reconstruction of existing structures, operations and facilities) outside their normal craft jurisdiction (i) if such work is integrated and concomitant with their primary work assignment and so long as it does not exceed four (4) hours on any project, (ii) if a Trade working on a project needs assistance in completing the project provided such assistance does not exceed four (4) man hours of work on any project, or (iii) for work on minor projects performed at the Water park and/or Hotel complex. In the event such assignment requires overtime, the employee assigned shall complete the job and the four (4) hour limitation shall not be applicable to overtime hours. The Company agrees to meet with representatives of the Service Trades Council once every month, if so requested, to review and discuss in good faith any complaints and to receive alternative suggestions from the Service Trades Council regarding work assignments.

**Section 15.2**. Assignment To Two Or More Different Job Classifications. The Company may assign an employee to work at two (2) or more different job classifications during a workday either temporarily or permanently for any period of time. Whenever an employee is assigned or transferred to performing two (2) or more job classifications during the day, the employee will receive his full-time rate or the rate for the job to which he was transferred, whichever is higher, for the number of hours worked on each job. This provision, Article 15, Section 15.2, shall not be applicable to Trades' employees.

**Section 15.3**. Assignment To New Job Classification. An employee assigned to a job classification other than the job classification which is his permanent status, shall have the right to request not to be assigned to such job classification but he shall not have the right to arbitrarily refuse the new assignment until such new assignment can be filled by another employee. Such employee shall not be required to work against his desire in the new job

classification for a period of time exceeding thirty (30) workdays. This provision, Article 15, Section 15.3, shall not be applicable to Trades, employees.

## ARTICLE 16: LEAVES OF ABSENCE

**Section 16.1.** Temporary Leave Of Absence. A full-time employee's request for a leave of absence not to exceed thirty (30) days will be granted for good cause, if the employee's services can reasonably be spared. All leaves of absence under Article 16 will be granted in writing and shall be unpaid. Subject to the requirements of federal and state law, no leave of absence will be extended beyond thirty (30) days except for compelling reason.

**Section 16.2.** Leave for Union Business. An employee accepting a full-time position with the Union shall be entitled to a leave of absence for a period not to exceed one (1) year without pay from the date of accepting such position during which time he shall retain and accumulate seniority.

**Section 16.3.** Family Medical Leave. The Company and the Union acknowledge that the provisions of the Family Medical Leave Act of 1993 and the New Jersey Family Leave Act may apply to the employees working under this Agreement. Thus, nothing in this Agreement shall be construed as being inconsistent with the requirements of the Family Medical Leave Act of 1993 and the New Jersey Family Leave Act, and the Company and the Union commit to meet to resolve potential conflicts between Federal and State Law and this Agreement. Employees may use accrued paid leave, if any, including sick leave, personal leave and vacation leave, for all Family Medical Leave as defined in the Family Medical Leave Act of 1993 and the New Jersey Family Leave Act.

**Section 16.4.** Pregnancy Leave. A pregnant employee may continue her employment so long as she is able, except that employees employed in a potentially hazardous classification may continue their employment so long as a doctor of her selection certifies that her health will not be endangered by the performance of her usual work assignment. Such employee must return to work at such time as a doctor of her choice certifies that her health will not be endangered by the performance of her usual work assignment. Subject to the requirements of Federal and State Law, under no circumstance shall a pregnancy leave be treated any differently than any other disability leave of absence permitted by the Company.

## ARTICLE 17: DISCIPLINE, STANDARDS OF CONDUCT AND DISCHARGE

**Section 17.1.** Standards of Conduct. High standards of conduct are necessary to preserve the Company's public image and to insure a safe, harmonious and productive working atmosphere.

**Section 17.2.** Discipline for Sufficient Reason. The Company has a right to issue written reprimands, discharge or otherwise discipline any employee for just cause, and this right is reserved exclusively to management. Any employee who feels that his/her discipline is unwarranted shall have recourse to the grievance and arbitration procedures provided in this Agreement.

**Section 17.3.** Written Reprimands. Whenever the Company, in its sole discretion, reduces a reprimand to writing, it shall be signed by the Supervisor who will present and discuss the reprimand with the employee. It shall also be signed by the employee, not in admission of the offense, but in acknowledgement that a copy of the reprimand has been delivered to the employee. A copy of such written reprimand will be furnished to the Union.

**Section 17.4.** Disciplinary Action – Discharge. An employee may be discharged for just cause, which includes, but is not limited to, the following:

**(1)**     Insulting, arguing, being discourteous, or using profane language in the presence of a guest.

**(2)**     Fighting at SIX FLAGS GREAT ADVENTURE, regardless of who provokes it, may result in automatic termination of both parties involved.

**(3)**     Falsification of records, such as medical forms, time cards or employment applications.

**(4)**     Any violation of the Company's Drug and Alcohol Policy as set forth in Addendum E.

**(5)**     Conviction of, or plea of guilty to, any "morals" charge, felony or misdemeanor, other than minor traffic offenses.

**(6)**     Violation of operating rules and procedures, which may result in damage to Company property or in bodily injury to the employee or to fellow employees or to guests.

**(7)**     Gambling or sleeping while on duty.

**(8)**     Dishonesty or misconduct that is detrimental to the Company.  The term "dishonesty" includes, without limitation, theft of Company property or theft of another employee's property.

**(9)**     Continued violation of grooming policy or Article 23

**(10)**    Attendance Policy-
           If 3 unscheduled absences occur within 180 days, the employee may receive a verbal warning;
           If 6 unscheduled absences occur within 180 days, the employee may receive a writing warning;
           If 9 unscheduled absences occur within 180 days, the employee may be subject to termination;
           Each Trade will receive a contact number in the event they need to call out for the day.
           Exceptions to the preceding which may result in immediate disciplinary action, up to and including termination include but are not limited to:
           -  Absences not called in within the two (2) hour notice period
           -  No Call/ No Show
           For the purpose of the above guidelines, if three (3) or more consecutive days are missed due to personal illness, or illness of a family member, and acceptable documentation is provided, the missed days will be counted as one (1) absence. If documentation is not provided, the missed days will be counted as the individual absences and be dealt with accordingly.

**(11)**    Willful insubordination.

**(12)**    Defacing, destroying or misuse of Company furnished costumes and equipment.

**Section 17.5.** Disciplinary File. All disciplinary notices issued to employees on or after January 1, 2000 shall remain in the employee's disciplinary file for a period of eighteen (18) months following its issuance.  Provided that the employee does not receive a subsequent disciplinary notice (for any reason) during the eighteen (18) month period, the original disciplinary notice will be expunged from the employee's disciplinary file.

**Section 17.6**. Termination Day. Any employee terminated or laid off for lack of work and not directed to report back to work within the particular workweek shall receive all monies due him/her for hours worked, and any accrued benefits, no later than the next regularly scheduled payday after the termination or layoff.

For New Construction only, an employee laid off for lack of work and not directed to report back to work within the particular workweek shall receive all monies due him/her for hours worked on the day he/she is laid off, unless such lay off effects twenty (20) or more employees in which case the laid off employees shall receive all monies due them for hours worked the next day after the lay off.  This Section 6 should also apply where the Company acts as general contractor on new construction.

## ARTICLE 18: GRIEVANCE PROCEDURE

**Section 18.1.** Definitions.

**(a)** Grievance: A grievance, within the meaning of this procedure, is defined as a dispute or difference of opinion between the parties concerning the meaning, interpretation, application or alleged violation by the Company of this agreement.
**(b)** Company Grievances: Should the Company believe that a signatory Union is not complying with the terms of this Agreement; the Company may initiate and process a grievance concerning the meaning, interpretation, or application of this Agreement.  Company grievances will be commenced at Step iv.

**Section 18.2.** Grievances Settled According To Procedure

**(a)** All complaints, disputes or grievances arising between the parties concerning the parties, involving questions of interpretation or application of any clause in this Agreement or any acts, conduct or relations between the parties, directly or indirectly, which arise out of this Agreement shall be resolved by the following method:

**(i)**      Employee represented by the shop steward shall take up the grievance with his/her immediate supervisor within five (5) days of the occurrence giving rise to said grievance.

**(ii)**      In the event said grievance cannot be adjusted at Step (i), the employee, not later than ten (10) days after the event giving rise to the grievance, must submit a written grievance to his/her immediate supervisor.  The written grievance shall set forth the relevant information concerning the grievance, including a short description of the alleged grievance, the date on which the grievance occurred, and an identification of the Section of the Agreement alleged to have been violated.

**(iii)**      In the event said grievance cannot be adjusted at Step (ii), the employee, represented by the shop steward, shall endeavor to adjust the complaint with the supervisor and the Company's Manager, Human Resources or his/her designee.

**(iv)** If said grievance is not resolved at Step (iii), within forty-eight (48) hours, the parties shall submit the grievance for determination by a Union officer and the designated representative of the Company.

**(v)** If said dispute is not resolved at Step (iv), within three (3) days, the grievance may be submitted, upon mutual agreement of the parties, to the New Jersey State Board of Mediation for alternative dispute resolution mediation for a proceeding which shall take place no later than fourteen (14) days from the date of its submission.

**(vi)** If the dispute is not submitted to or resolved through the alternative dispute resolution mediation procedure in Step (v), the grievance may be submitted to arbitration under the rules of the New Jersey State Board of Mediation within three (3) days after alternative dispute resolution has been refused or has failed to produce agreement. The decision of the arbitrator shall be final and binding upon the parties. The cost of the arbitrator shall be borne equally by the parties.

**(vii)** The Company agrees to utilize the Grievance and Arbitration procedure and form set forth in Addendum H in answering in writing all Local 54 grievances.

**Section 18.3.** Jurisdictional Disputes Resolution Procedure. The Company agrees that within twenty-four (24) hours after notification in writing by the Building Trades Council of an award of work jurisdiction on a new project and/or new or modified piece of equipment, it will assign the work as notified. However, the Company shall be consulted before the Trades' award is formally published. In the event of an award of jurisdiction, the Company shall not be responsible for any retroactive pay differential for any work assignment prior to twenty-four (24) hours after receipt of the written notice. If the Company disagrees with the award of jurisdiction, it shall have the right to grieve same under the grievance procedure set forth herein. The parties further agree that as to present or past work, past practice as to jurisdiction shall prevail, and further, no employee will be subjected to disciplinary action for filing a grievance relating to a jurisdictional dispute. This paragraph shall in no way limit the rights of the Company under Article 15.

## **ARTICLE 19: HOLIDAYS**

**Section 19.1.** Eligibility. All full-time employees and Supplemental Maintenance Employees who have worked in excess of forty-five (45) calendar days are eligible for holiday pay for holidays, in accordance with the Company's Holiday Plan, falling after completion of the employee's probationary period, provided they work their scheduled shifts immediately preceding and immediately following the date observed as the holiday. If an employee's failure to work his regularly scheduled shift immediately preceding or immediately following the holiday was due to personal illness, injury or death in the immediate family and the employee satisfies the Company in this respect, he shall be eligible to receive holiday pay.

**Section 19.2.** Holiday Pay When Not Worked. Each full-time employee will receive pay at the employee's regular straight time rate for the normal daily hours scheduled for each such holiday not worked.

**Section 19.3** Holiday Pay When Worked. Each full-time employee who works on an observed holiday (other than a floating holiday), and who works his/her scheduled shifts immediately preceding and immediately following the holiday worked, shall receive his/her holiday pay plus time and one-half of his/her straight-time hourly rate for all hours worked in his/her

scheduled shift; provided that if the Company operates the park during any holiday or extends the operating season through such holiday, such employee shall receive only his/her straight-time hourly rate (and no premium) for all hours worked on such holiday. The following holidays will be paid at time and one half (1 ½) for all hours paid (as per section 10.4) on said holiday: Thanksgiving, Christmas Eve, and Christmas Day.

**Section 19.4.** Holiday Falling During Employee's Vacation. Should a holiday fall during the period of a full-time employee's vacation, the employee will not be charged a vacation day on the day the holiday falls. The employee will be paid for the holiday at straight time.

**Section 19.5**. Day Holiday Is Observed. Recognized holidays shall be observed on the date designated for observance by the Federal Government.

**Section 19.6.** No Holiday Pay For Employee Scheduled To Work Holiday And Who Does Not Work. An employee who is regularly scheduled to work on a recognized holiday and who does not work shall not receive holiday pay.

**Section 19.7.** Holiday Pay On Day Off When Worked. If a holiday falls on one of the full-time employee's two regular days off and the employee works on said holiday, he shall receive holiday pay for his regularly scheduled shift, plus the rate he would have received if it had not been a holiday.

**Section 19.8.** Holiday Starts At 8:00 a.m. On Holiday. For the purpose of computing pay for work on a holiday, the twenty four (24) hour holiday period shall commence at 0800 on the holiday and terminate at 0800 the following day.

**Section 19.9.**. Supplemental Maintenance Employees will be paid one days Holiday pay for every thirty (30) calendar days they are employed.

**Section 19.10.** The Employer will provide the Service Trade Council yearly with a list of approved Holidays for the next calendar year. The parties agree that bargaining unit employees will receive two (2) less holidays then listed however; there will be a minimum of twelve (12) holidays each year.

## ARTICLE 20: VACATION

**Section 20.1.** Eligibility, Full Time Employees. All full-time employees and Supplemental Maintenance Employees who have worked in excess of forty-five (45) calendar days shall receive a vacation based on the number of hours worked from the date of hire to the end of the calendar year thereafter, based upon the conditions set forth in this Article.

**Section 20.2.** Vacation Earned In First Calendar Year. Vacation earned in the first (1st) calendar year of service may not be used until six (6) months of continuous service has elapsed from the date of hire. Vacations thereafter shall be on a calendar year basis during the year in which the vacation time accrues.

**Section 20.3**. Schedule Of Paid Vacation Hours Earned. Full-time employees and Supplemental Maintenance Employees who have worked in excess of forty-five (45) calendar days will earn paid vacation hours for which they are otherwise eligible on the basis of hours worked in the calendar years during the first nine (9) years of their continuous service as follows:

| Hours Worked In Calendar Year | Paid Vacation Hours Earned |
|---|---|
| 1800 | 40 |
| 1440 | 30 |
| 1040 | 20 |
| 520 | 10 |

All full-time employees who have one (1) year of service shall receive one (1) week's vacation with pay. All full-time employees who have two years of service shall receive two (2) weeks vacation with pay. All full-time employees who have more than one (1) year but less than two (2) years shall receive an amount proportionate to their term of service during the calendar year e.g., if the anniversary date of the employee is July 1, and during the first full calendar year of his employment the employee works 1800 hours, the employee would be entitled to 60 paid vacation hours.

**Section 20.4**. Schedule of Paid Vacation Hours Earned For Full-Time and Supplemental Employees After Nine (9) Years. The formula for computing maximum vacation allowances for full-time employees, on the first day of the tenth (10th) anniversary of continuous service occurs, shall be as follows:

| Hours Worked In Calendar Year | Paid Vacation Hours Earned |
|---|---|
| 1800 | 120 |
| 1620 | 108 |
| 1440 | 96 |
| 1260 | 84 |
| 1080 | 72 |
| 900 | 60 |
| 720 | 48 |
| 540 | 36 |
| 360 | 24 |
| 180 | 12 |

Notwithstanding the foregoing, the schedules set forth in this Section shall apply to employees who are within the jurisdiction of "Local 54" after the seventh (7th) anniversary of continuous service occurs.

**Section 20.5.** Vacations - Not Cumulative. Except for vacation time accrued during the first calendar year of service which employees are ineligible to take during the calendar year, vacations are not cumulative and must be taken within the calendar year the employee becomes eligible to take his vacation. Except as herein set forth, vacations not used within the calendar year in which the employee becomes eligible to take his vacation shall be lost.

**Section 20.6.** Vacation Scheduling. Due to the nature of the Company's operations and its requirement for specified skills, vacations will be scheduled by the Company. Consideration will be given to requested time by the employee whenever possible. Employees with greater length of service will be given preference in the event of a conflict of dates affecting two (2) or more employees.

**Section 20.7.** Pay Rate for Vacations. Vacation will be paid at the employee's rate in effect at the time the vacation is taken.

.**Section 20.8.** Pay For Unused Vacation Hours At Termination of Employment.

**(a)** All full-time employees who have been continuously employed for six (6) months or longer and who terminate their employment shall receive payment for all unused vacation hours earned based on the number of hours worked in accordance with the foregoing applicable formula.

**(b)** All full-time employees whose employment is terminated for any reason will be paid for hours worked in the present calendar year.

## ARTICLE 21: JURY DUTY AND BEREAVEMENT LEAVE PAY

**Section 21.1**. Jury Duty For Full-time Employees. All full-time employees are eligible for jury duty pay provided that they have completed their probationary period.

**(a)** The Company will pay an employee the difference between the fee he receives for jury service and the equivalent for services for his/her regularly scheduled shift, provided such time shall not exceed eight (8) hours in any day and forty (40) hours in any pay period week or ten (10) hours in any day and forty (40) hours in any pay period week for any employees on such a schedule.

**(b)** If an employee is released from jury duty and four (4) or more hours remain in his scheduled shift, he is required to return to work that day.

**(c)** The Company reserves the right to petition the court to excuse any eligible employee for jury service when such employee's services are needed by the Company because qualified replacements are not available or the employee's absence would result in a hardship to the Company.

**Section 21.2.** Bereavement Leave Pay. The Company shall retain for full-time employees only its funeral leave pay program for death in the employee's immediate family for a period not to exceed three (3) days for the purposes of attending the funeral.  Payment is available for scheduled work shifts, which the employee misses due to travel time and attendance at such funeral.  Proof of death and relationship to decedent may be required. Immediate family shall include parents, step-parents, current mother-in-law or father-in-law, spouse, siblings, children, stepchildren, grandparents, grandchildren or other blood relatives living in the same household as the employee.

## ARTICLE 22: WAGE AND BENEFIT FUNDS

**Section 22.1.** Wages.

**(a)** Effective January 1, 2018, January 1, 2019, January 1, 2020 and January 1, 2021, the wage and benefit rates for each employee other than those employees represented by Local 54, shall be as set forth in Addendum B-1.  The amounts listed as "Wages Plus Benefits" represent the total wage and benefit package per classification. The total package of wages plus benefits shall not exceed the amounts listed under "Wages Plus Benefits" above and the increases will be allocated to wages and benefit funds as determined by the STC affiliates, which may be given no more than two (2) times per year.  In this regard, the wage rates in Addendum B-1 and the contributions to the benefit funds set forth in Addendum F in effect at the time of the

Agreement shall remain constant for the duration of the Agreement, except to the extent that the Unions allocate funds made available under this paragraph to such benefit funds or wage rates.

**(b)** Effective January 1, 2018, January 1, 2019, January 1, 2020 and January 1, 2021, the wage for each full-time employee represented by Local 54 shall be as set forth in Addendum C-1.  In accordance with the above, the Company agrees to make all contractually required benefit fund contributions to the appropriate designated benefit funds as set forth in Addenda D and F.

**(c)** The contractual wage increases will be 2.75% effective 1/1/18; 3% effective 1/1/19, 3% effective 1/1/20 and 3% effective 1/1/21.

## ARTICLE 23: COSTUMES, UNIFORMS AND PERSONAL APPEARANCE

**Section 23.1**. Costumes and Work Uniforms. If the Company requires an employee to wear a uniform or costume, it will be furnished at the Company's expense.  Shoes shall be furnished at the employee's cost even if uniformity is required, provided they are generally accepted as street wear.  All full-time employees shall be supplied with appropriate winter clothing.

**Section 23.2.** Safety And Sanitary Clothing And Equipment. Where the Company, for safety purposes, requires the use of protective clothing, safety or other safety devices, other than hairnets and headbands, they will be furnished without cost to the employees.  Effective January 1, 2009, the Company shall provide a safety footwear/shoe voucher up to Seventy-five ($75.00) per years.  The Union agrees to require fulltime employees in those classifications listed in Addenda B and C to use the devices furnished.  The Company shall not be required to supply and/or pay for regular work shoes.

**Section 23.3.** Laundry and Cleaning of Clothing Paid By Company. The cost of cleaning or laundering the clothing furnished under this Article shall be paid by the Company.  Such clothing and other equipment will at all times remain the property of the Company and the employee who is issued any of these items will be fully responsible for seeing that they are properly cared for.

**Section 23.4.** Penalty For Lost Clothing Or Misuse Of Clothing And Lost Locker Keys. Each employee will be required to sign an authorization for the Company to deduct from wages the amount of money necessary to replace the employee's Company furnished uniform in the event the uniform is not returned when required, or is defaced or is willfully damaged.  An unreturned or lost locker key will result in a wage deduction in the amount necessary to replace the lock on an employee's locker.  An employee, who willfully defaces, destroys or misuses a Company furnished uniform is subject to disciplinary action, including dismissal.

**Section 23.5.** Personal Appearance Rules Set Forth In Writing. It is recognized that the Company may from time to time, in its sole discretion, make and enforce rules relating to the personal appearance of its employees which must be set forth in writing, including without limitation, rules that prohibit the wearing of Union insignias or buttons.

**Section 23.6**. Furnished Clothing Not To Be Worn Off Six Flags Great Adventure Premises. Company-furnished clothing is not to be worn off the Six Flags Great Adventure premises outside of employee's working hours.

**Section 23.7.** Violations. Any violation of Article 23 may result in discipline up to and including discharge.

## ARTICLE 24: SAFETY AND HEALTH

**Section 24.1.** Company Responsibility. The Company will continue to make reasonable provisions for the safety and health of its employees during the hours of their employment. The Company shall post rules, which shall be adhered to by both management and employees. The Company agrees that it will furnish and maintain sanitary toilet facilities, washrooms, lockers and changing quarters for all employees covered by this agreement.

**Section 24.2.** Employee Responsibility. All employees shall obey the Company's posted reasonable safety and health rules.

**Section 24.3.** Company-Union Cooperation. Representatives of the Company and the Union shall cooperate in the enforcement of all rules and practices to further safe and sanitary working conditions. The Company may hold safety meetings with required attendance by every employee covered by this Agreement, on work time, as a means of improving safety and educating employees in safe practices. A Union representative may attend such meetings.

## ARTICLE 25: WORK BY SUPERVISORS

It is recognized that the duties of a supervisor are, as the designation implies, largely of a supervisory nature. Accordingly, supervisors shall not perform work such as that performed by the employees as herein defined, except:

**(a)**     For emergency purposes.

**(b)**     In the instruction and training of employees or supervisors.

**(c)**     Work of an experimental nature.

**(d)**     Testing materials and production.

**(e)**     Start-up and closing down of operations.

**(f)**     To protect Company property and/or to insure the safety of employees or guests.

**(g)**     To cover employee absenteeism that is unexpected and cannot be covered by normal procedures.

## ARTICLE 26: EMERGENCY WORK AND RUNNING REPAIRS BY EMPLOYEES

**Section 26.1.** Emergency Work. Any employee may be requested to perform emergency work, which includes any situation endangering other persons or which might result in property damage (including any damage resulting from unexpected equipment failure).

**Section 26.2.** Running Repairs. Running repairs may be performed by operating personnel covered by this Agreement, or by personnel regularly assigned to the department where the need for such repairs occurs. Running repairs are generally defined as minor maintenance repairs or adjustments, which can be done without a cessation of normal operations, or where

27

such repairs or adjustments can restore such equipment or unit to operation without an extended shutdown.

## ARTICLE 27: BULLETIN BOARDS

The Company shall provide bulletin boards in areas, designated by the Company, which are frequented by employees for the posting of official Union notices. The board shall be covered with glass and under lock. The key shall remain in the possession of a department manager. These boards shall be used for the display of the following notices: Union meetings, Union appointments, Union elections and official Union social affairs and any Company issued information. It is agreed that no Union matter of any kind shall be posted in and about the premises of Six Flags Great Adventure except on said boards. It is agreed by the Union and the Company that it is the responsibility of each employee to be knowledgeable of notices posted. All such Union notices shall bear a posting date and a removal date. The Company will ensure there is space for all Local 54 postings in the following employee areas: ESOs, Back Stage Diner, Wardrobe/Trader Docs, Safari Administration, Entertainment administration, and in any other mutually agreeable location.

## ARTICLE 28: SUBCONTRACTING

During the term of this Agreement, the Company agrees that it will not subcontract work for the purpose of evading its obligations under this Agreement. However, it is understood and agreed that the Company shall have the right to subcontract in the following instances and will give notice of such subcontracting to the Union when possible:

**(a)**     Where some work is required to be sublet to maintain a legitimate manufacturer's warranty; or

**(b)**     Where the subcontracting of work will not result in the termination or layoff, or the failure to recall from layoff, of any full-time employee qualified and classified to do the work; or

**(c)**     Where the employees of the Company lack the skills or qualifications or the Company does not possess the requisite equipment for carrying out the work; or

**(d)**     Where, because of size, complexity or time of completion, it is impractical or uneconomical to do the work with Company equipment and personnel; or

**(e)**     For the set up and removal of shows or special events, provided that, in the event the operator of the event requires additional help, such help shall come from the Trades; or

**(f)**     New Construction, provided that said contractor executes the Project Labor Agreement attached as Addendum G or H to this Agreement; as applicable.

## ARTICLE 29: SICK PAY, PERSONAL DAY AND HOSPITALIZATION

**Section 29.1.** Sick Pay (Local 54 and Teamster employees only)

**(a)** Employees must work for eight (8) consecutive weeks before they become eligible for sick pay.

**(b)** Upon completion of the eight (8) week period, the employee shall be deemed to have accrued one and one-half (1-1/2) days of sick pay.

**(c)** Thereafter, employees shall accrue sick pay at the rate of three-fourths (3/4) of one day's regular rate of pay for every four (4) weeks worked. Employees may accrue a maximum of six and one-half (6.5) day's sick pay.

**(d)** Sick pay is not cumulative, and does not carry over from year to year. Unused sick pay shall be paid out to employees annually during the week of December 25. Employees who have worked eight (8) weeks prior to January 1 shall again begin to accrue sick days in accordance with paragraph (c) commencing January 1. Abuse of sick pay is subject to review.

**(e)** Employees who are ill three (3) or more consecutively scheduled workdays shall submit a doctor's certificate to First Aid detailing the nature of the illness. First Aid will complete the Employee Injury/Illness log, and authorize the employee's return to work.

**Section 29.2.** Hospitalization.

**(a)** Employees who are hospitalized and who have been employed more than three months, but less than two (2) years, are entitled to up to three (3) weeks (fifteen working days) per year of pay at the rate of eighty (80%) percent of their regular weekly base pay rate.

**(b)** Employees who are hospitalized and who have been employed between two (2) years, but less than five (5) years, are entitled to up to four (4) weeks (twenty working days) per year of hospitalization pay at one hundred (100%) percent of their regular weekly base pay rate.

**(c)** Employees who are hospitalized and who have been employed between five (5) years, but less than ten (10) years are entitled to up to eight (8) weeks (forty working days) per year of hospitalization pay at one hundred (100%) percent of their regular weekly base pay rate.

**(d)** Employees who are hospitalized and who have been employed more than ten (10) years, are entitled to up to twelve (12) weeks (sixty working days) per year of hospitalization pay at one hundred (100%) percent of their regular weekly base pay rate.

## ARTICLE 30: INTERPRETATION

The parties hereto may interpret, alter or amend this Agreement by mutual action, and no individual employee shall have cause to complain therefore, it being understood that any interpretation or arrangement mutually satisfactory to the parties hereto shall be binding upon all individual employees, whether such action be prospective or retroactive. Any such interpretation, alteration or amendment to this Agreement shall not be binding unless made in writing and executed by the parties.

## ARTICLE 31: SEVERABILITY

It is not the intent of either party hereto to violate any laws or any rulings or any regulations of any governmental authority or agency having jurisdiction of the subject matter of this Agreement and the parties hereto agree that in the event any provision of this Agreement is

held or constituted to be void as being in contravention of any such laws, rulings or regulations nevertheless, the remainder of the Agreement shall remain in full force and effect, unless the parts so found to be void are wholly inseparable from the remaining portion of this Agreement.

## ARTICLE 32: MISCELLANEOUS

**Section 32.1.** Past Practices. With respect to all Union employees, the parties have agreed that past practices of any kind, if not listed herein, shall not be binding and that the Agreement shall control, provided, however, that this shall not apply to jurisdictional past practices.

**Section 32.2**. Premium Pay. Work which has heretofore been classified or described as "high time" and "diving time" will be paid only for time authorized by the Company to be spent in such activities and shall be paid to the nearest successive hour.

**Section 32.3.** Rules of Conduct. The Company agrees to forward to the Union a copy of any modifications or additions to the Employee Handbook or to other written policies governing rules of conduct or other terms or conditions of employment within five (5) working days prior to such policies being distributed or issued to employees.  The Union recognizes that the Company's agreement to provide copies of such policies to the Union shall not prevent implementation of such policies consistent with the Company's management rights and serves only to notify the Union with regard to such policies.

## ARTICLE 33: TERM OF AGREEMENT

**Section 33.1.** Term. This Agreement and any amendment or supplement hereto shall be in full force and effect from January 1, 2018, through December 31, 2021, and from year to year thereafter unless sixty (60) days prior to the expiration of this Agreement, or any extension thereof, either party gives written notice to the other party of termination or modification of this Agreement.

**Section 33.2.** Complete Agreement. The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties, after the exercise of that right and opportunity, are set forth in this Agreement and any addenda and side letters annexed hereto.  Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waive the right and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to or covered in this Agreement, except as provided specifically in Section 33.2 of this Article, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Agreement.

**Section 33.3.** Assignment of Contract. In the event the operation of Six Flags Great Adventure is transferred from the Company to any division or affiliate of the Company, this Agreement shall be assigned to that entity and the terms and conditions of this Agreement shall remain in full force and effect to the Union.

**Section 33.4.** Sale of Park. In the event the Company concludes an agreement to sell Six Flags Great Adventure as a going concern to an unaffiliated third party, it shall be a condition of any

such sale, by the Company, and shall be provided in the contract of sale, that the purchaser assume, as of the date of purchase, this Agreement; hire all employees described in Article 3, Section 3.1 hereof; and recognize the Union as the duly designated representative of those employees. In the event the Company concludes an agreement to sell the Six Flags Great Adventure it shall:

**(a)** Notify the Union of the proposed sale a reasonable time prior to the close of said transaction and

**(b)** The successor of Six Flags Great Adventure shall in the event of any layoffs or recalls by virtue of said sale, do so only in accordance with the seniority provisions of the Agreement or any addenda thereto and that, further, said successor or assigns shall, unless otherwise agreed, maintain the local wage and fringe benefit standards as more fully described at Exhibits B-1, B-2, B-3, C-1 and C-2 of the Contract.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and effective as of the day and year first above written.

**FOR THE SERVICE TRADES**                           **FOR THE COMPANY**
**COUNCIL UNION:**                                    **SIX FLAGS GREAT ADVENTURE:**


_____                              _____

**Sam Rubino**                                       **Neal Thurman**


_____                                 _____

**Date**                                             **Date**

31

## <u>TOTAL LIST OF ADDENDUMS AND SIDE AGREEMENTS</u>

**1)**  ADDENDUM A: UNITEHERE <u>LOCAL 54:</u> CONCESSIONAIRES AGREEMENT

**2)**  ADDENDUM B-1: FULL-TIME MAINTENANCE: SERVICE <u>TRADES.</u>

**3)**  ADDENDUM B-2: SEASONAL WAREHOUSE: (<u>TEAMSTER</u>) EMPLOYEES AND ADDENDUM B-3

**4)**  ADDENDUM C-1: UNITEHERE <u>LOCAL 54</u>: LOCAL 54 FULL-TIME:
        HOURLY RATE OF COMPENSATION

**5)**  ADDENDUM C-2: UNITEHERE <u>LOCAL 54</u>: LOCAL 54 SEASONAL

**6)**  ADDENDUM D: UNITEHERE <u>LOCAL 54</u>: <u>LOCAL 54 BENEFIT FUNDS AGREEMENT</u>

**7)**  EXHIBIT 1: UNITEHERE <u>LOCAL 54</u>: WAIVER OF HEALTH AND WELFARE COVERAGE

**8)**  ADDENDUM E; UNITEHERE <u>LOCAL 54</u> and SERVICE <u>TRADES</u>: SIX FLAGS GREAT
        ADVENTURE DRUG AND ALCOHOL TESTING POLICY

**9)**  ADDENDUM F: SERVICE TRADES COUNCIL AFFILIATE BENEFIT <u>FUNDS</u>

**10)**  ADDENDUM G: SERVICE <u>TRADES</u>: NEW CONSTRUCTION PROJECT LABOR AGREEMENT

**11)**  EXHIBIT G: LETTER OF ASSENT: SERVICE <u>TRADES</u>

**12)**  ADDENDUM H: UNITEHERE LOCAL 54: <u>LOCAL 54</u> GRIEVANCE FORM AND
        PROCEDURES.

**13)**  ADDENDUM I (1) SIDE LETTER OF INTERPRETATION: SERVICE <u>TRADES</u>: SUBCONTRACTING
        ISSUES.

**14)**  ADDENDUM I (2) CONCESSIONAIRES SIDE LETTER: UNITEHERE <u>LOCAL 54</u>

**15)**  ADDENDUM I (3) SIDE LETTER: RE: USING COMPOSITE CREW UNDER LIMITED
        CIRCUMSTANCES: SERVICE <u>TRADES.</u>

**16)**  ADDENDUM J: UNITEHERE <u>LOCAL 54:</u> PAYROLL DEDUCTION FOR SUPPLEMENTAL
        INSURANCE

**17)**  ADDENDUM K: SUPPLEMENTAL AGREEMENT UNITE HERE NATIONAL RETIREMENT
        FUND: <u>LOCAL 54</u>

**18)**  ADDENDUM L PARTICIPATION AGREEMENT NATIONAL PLUS PLAN 401 K PLAN
        L<u>OCAL 54</u>

**19)**  ADDENDUM M UNITE HERE INTERNATIONAL UNION TIP <u>LOCAL 54</u>

**20)**  ADDENDUM N TEAMSTERS PENSION REHABILITATION AGREEMENT

**(1)**                    <u>**UNITEHERE LOCAL 54**</u>

<u>**ADDENDUM A**</u>

<u>**CONCESSIONAIRES AGREEMENT**</u>

And now, this 1st day of, January, 2018 it is hereby agreed by and between the Service Trades Council of Ocean and Monmouth Counties (hereinafter referred to as the STC) and (hereinafter referred to as concessionaire), that upon utilization of personnel at SIX FLAGS GREAT ADVENTURE that the said concessionaire hereby agrees to be bound by all terms and conditions in the Agreement between SIX FLAGS GREAT ADVENTURE and the STC, as if they themselves were signatories in the first instance.

Said concessionaire further agrees that it recognizes the STC as the collective bargaining representative of its employees employed at SIX FLAGS GREAT ADVENTURE and that it agrees to be bound by all terms and conditions of employment for its employees at SIX FLAGS GREAT ADVENTURE as set forth by the Master Agreement and that all dealing in that regard and all matters of whatever nature or kind which are either covered by the Master Agreement or which in any way deal with the employment of its employees at SIX FLAGS GREAT ADVENTURE shall be handled and resolved solely between the concessionaire and the STC, as the authorized collective bargaining representative of the said employees.

IN WITNESS THEREOF, the parties above-mentioned have set their hands and seals to this Agreement the day and year first above written.

**Service Trades Council**                    **Concessionaire**

**BY:** _____          **BY:** _____

**FOR THE COMPANY**
**SIX FLAGS GREAT ADVENTURE,**

_____
**Neal Thurman**

**(2)**                     **SERVICE TRADES**
                            **ADDENDUM B-1**

**FULL-TIME MAINTENANCE**

| Classification | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Carpenters/Fiberglass:** | | | | | |
| General Foreman | $66.36 | $68.18 | $70.23 | $72.34 | $74.51 |
| Foreman (Lead) | $58.67 | $60.28 | $62.09 | $63.95 | $65.87 |
| Journeyman | $50.99 | $52.39 | $53.96 | $55.58 | $57.25 |
| 4th Yr. Apprentice | $43.32 | $44.51 | $45.85 | $47.22 | $48.64 |
| 3rd Yr. Apprentice | $33.16 | $34.07 | $35.09 | $36.15 | $37.23 |
| 2nd Yr. Apprentice | $24.87 | $25.55 | $26.32 | $27.11 | $27.92 |
| 1st Yr. Apprentice | $20.44 | $21.00 | $21.63 | $22.28 | $22.95 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Millwrights/Ride Mechanics:** | | | | | |
| General Lead-Red Circle | $66.36 | $68.18 | $70.23 | $72.34 | $74.51 |
| Foreman (Lead) | $58.67 | $60.28 | $62.09 | $63.95 | $65.87 |
| Journeyman | $50.99 | $52.39 | $53.96 | $55.58 | $57.25 |
| 4th Yr. Apprentice | $43.32 | $44.51 | $45.85 | $47.22 | $48.64 |
| 3rd Yr. Apprentice | $33.16 | $34.07 | $35.09 | $36.15 | $37.23 |
| 2nd Yr. Apprentice | $24.87 | $25.55 | $26.32 | $27.11 | $27.92 |
| 1st Yr. Apprentice | $20.44 | $21.00 | $21.63 | $22.28 | $22.95 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Electricians:** | | | | | |
| General Forman | $64.69 | $66.47 | $68.46 | $70.52 | $72.63 |
| Foreman (Lead) | $60.11 | $61.76 | $63.62 | $65.52 | $67.49 |
| Journeyman | $55.53 | $57.06 | $58.77 | $60.53 | $62.35 |
| 4th Yr. Apprentice | $46.42 | $47.70 | $49.13 | $50.60 | $52.12 |
| 3rd Yr. Apprentice | $39.52 | $40.61 | $41.83 | $43.08 | $44.37 |
| 2nd Yr. Apprentice | $32.68 | $33.58 | $34.59 | $35.62 | $36.69 |
| 1st Yr. Apprentice | $27.61 | $28.37 | $29.22 | $30.10 | $31.00 |
| Bulber | $16.28 | $16.73 | $17.23 | $17.75 | $18.28 |

## SERVICE TRADES
## ADDENDUM B-1

| **FULL-TIME MAINTENANCE** | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Ironworkers:** | | | | | |
| Foreman (Lead) | $69.29 | $71.20 | $73.33 | $75.53 | $77.80 |
| Journeyman | $66.93 | $68.77 | $70.83 | $72.96 | $75.15 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Laborers:** | | | | | |
| Foreman(Lead) | $50.02 | $51.40 | $52.94 | $54.53 | $56.16 |
| Journeyman | $46.55 | $47.83 | $49.27 | $50.74 | $52.27 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Masons:** | | | | | |
| Foreman (Lead) | $66.51 | $68.34 | $70.39 | $72.50 | $74.68 |
| Journeyman | $60.69 | $62.36 | $64.23 | $66.16 | $68.14 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Operating Engineer:** | | | | | |
| Class A - (Lead) | $69.63 | $71.54 | $73.69 | $75.90 | $78.18 |
| Class B | $67.46 | $69.32 | $71.39 | $73.54 | $75.74 |
| Class C - Auto | $61.63 | $63.32 | $65.22 | $67.18 | $69.20 |

## SERVICE TRADES
## ADDENDUM B-1

| **FULL-TIME MAINTENANCE** | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Painters:** | | | | | |
| Foreman(Lead) | $52.48 | $53.92 | $55.54 | $57.21 | $58.92 |
| Journeyman | $47.97 | $49.29 | $50.77 | $52.29 | $53.86 |
| Spray Rate | $50.82 | $52.22 | $53.78 | $55.40 | $57.06 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Plumbers:** | | | | | |
| General Foreman | $65.30 | $67.10 | $69.11 | $71.18 | $73.32 |
| Foreman(Lead) | $62.49 | $64.21 | $66.13 | $68.12 | $70.16 |
| Journeyman | $59.70 | $61.34 | $63.18 | $65.08 | $67.03 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Sheet Metal:** | | | | | |
| Foreman (Lead) | $69.70 | $71.62 | $73.77 | $75.98 | $78.26 |
| Journeyman | $66.52 | $68.35 | $70.40 | $72.51 | $74.69 |

| | 1/1/2017 Wages Plus Benefits | 1/1/2018 Wages Plus Benefits | 1/1/2019 Wages Plus Benefits | 1/1/2020 Wages Plus Benefits | 1/1/2021 Wages Plus Benefits |
|---|---|---|---|---|---|
| **Teamsters:** | | | | | |
| Foreman(Lead) | $48.98 | $50.33 | $51.84 | $53.39 | $54.99 |
| Journeyman | $48.52 | $49.85 | $51.35 | $52.89 | $54.48 |

The breakdown of Operating Engineers by class is set forth fully in the statewide agreement.

**NOTE:** In Addition To The Wage Rates Set Forth In This Addendum B-1, Full-Time Employees Hired Prior To January 1, 1994, Working In The Classifications Listed Herein Shall Receive Gas Coupons In The Manner Presently Practiced By The Company.

* The amounts listed as "Wages Plus Benefits" represent the total wage and benefit package per classification.  The total package of wages plus benefits shall not exceed the amounts listed under "Wages Plus Benefits" above and the increases will be allocated to wages and benefit funds as determined by the STC affiliates in accordance with Article 22 of this Agreement.

** The classifications listed for Operating Engineer refer to the classifications in the appendix to Local 825's statewide agreement.

**(3)**

# ADDENDUM B-2
## SEASONAL WAREHOUSE
## (TEAMSTER) EMPLOYEES

Teamsters

**.A.**     The following rates shall apply for all seasonal warehouse employees covered by this Agreement and there shall be no change in the status of current seasonal Teamsters:

| YEARS OF SERVICE | % OF FULL TIME RATE | BENEFITS |
|---|---|---|
| 1ST YEAR | 42.5% | 0 |
| 2ND YEAR | 42.5% | $1.19/HR |
| 3RD YEAR | 45.0% | $1.19/HR |
| 4TH YEAR | 47.5% | $1.19/HR |
| 5TH YEAR | 50.0% | $1.19/HR |
| 6TH YEAR | 52.5% | $1.19/HR |
| 7TH  YEAR | 100.0% | 100% |

Returning seasonal employees are those   employees who have completed at least ninety (90) days of continuous employment with the Company during the season immediately preceding the season during which additional pay is claimed.  All other employees shall be new hires.

**B.**     No employee shall lose the additional rates being paid as a result of past years of service on account of any layoff during the season, provided the employee is recalled within sixty (60) days from the date of the layoff.

**C.**     All returning employees may be eligible to receive an additional one dollar and nineteen cents ($1.19) per hour for each straight time hour worked. Said payment to be made monthly in the payroll period in which the first day of the month following the period falls.  An employee whose employment is terminated, except due to layoff, prior to the last day of the month in which the hours for which this payment is being made were worked, shall not be eligible for payment.  New employees are not eligible for the aforementioned contributions.

**D.**     Employees returning for the seventh consecutive season who have worked ninety (90) days or more in each of the preceding seasons shall be deemed full-time employees for the seventh season and shall receive the wages and benefits set forth in Addendum B-1.

**E.**     Vacation - All returning seasonal employees shall receive vacation upon successful completion of hours worked in accordance with the following schedule:

| Hours Worked | Vacation Hours Paid |
|---|---|
| 160 | 8 |
| 330 | 16 |
| 500 | 24 |
| 670 | 32 |
| 840 | 40 |

All vacation earned during the season will be paid off at the time of termination.  Total vacation to be paid at the end of each season will not exceed forty (40) hours total at the straight time hourly rate.

## SERVICE TRADES
## ADDENDUM B-3

And now on this 1st day of January  2018 it is hereby agreed by and between the Service Trades Council of Ocean and Monmouth Counties (hereinafter referred to as the STC) and Six Flags Great Adventure (hereinafter referred to as the Company), Safari Off Road Adventure Passenger Transport Drivers and all responsibilities set forth by the Company will be compensated at the following seasonal hourly wage:

● $11.81 per hour starting wage for all newly hired Team Members

● $1.19 per hour benefit pay for all newly hired and rehired Team Members

● 3% annual rehire incentive increase

The following has also been agreed to by both parties:

● This new classification and wage is for Safari Off Road Adventure Passenger Transport Drivers only

● This new classification and wage will not be listed under the new Addendum: Addendum B-3

● This new classification and wage will not be eligible for any supplemental or full time status or benefits including any holiday, sick, or vacation time accruals.

● This new classification and wage will not be eligible for any supplemental or full time status related to sections noted in the collective Bargaining Agreement.

IN WITNESS THEREOF, the parties have agreed to the above mentioned and have set their hands and seals of this Agreement.


**SERVICE TRADES COUNCIL**

_____                    _____
**Sam Rubino**                                     **Date**


**SIX FLAGS GREAT ADVENTURE**

_____                    _____
**Neal Thurman**                                   **Date**


**TEAMSTERS Local Union No. 469**

_____                    _____
                                                   **Date**

**(4)**

# UNITEHERE LOCAL 54
## ADDENDUM C-1
## LOCAL 54 FULL-TIME
## HOURLY RATE OF COMPENSATION

|  | 1/1/2017 | 1/1/2018 | 1/1/2019 | 1/1/2020 | 1/1/2021 |
|---|---|---|---|---|---|
| **Classification** |  |  |  |  |  |
| Cook | $21.29 | $21.88 | $22.53 | $23.21 | $23.90 |
| Dining Room | $21.82 | $22.42 | $23.09 | $23.79 | $24.50 |
|  |  |  |  |  |  |
| **Wardens** |  |  |  |  |  |
| Wardens Start | $22.36 | $22.97 | $23.66 | $24.37 | $25.11 |
| Wardens 90 Day | $22.66 | $23.28 | $23.98 | $24.70 | $25.44 |
| Wardens 1 Yr | $23.44 | $24.08 | $24.81 | $25.55 | $26.32 |
|  |  |  |  |  |  |
| **Landscape** |  |  |  |  |  |
| Landscape Lead | $29.40 | $30.21 | $31.11 | $32.05 | $33.01 |
| Landscape | $25.68 | $26.39 | $27.18 | $27.99 | $28.83 |

**NOTE:** Full-Time Employees Shall Be Entitled To An Additional Twenty-Five Cents ($0.25) Per Hour Upon Completion Of Their 5TH, 10TH, 15th AND 25TH YEARS OF CONTINUOUS SERVICE.  The parties agree that the past practices of increases on longevity will continue.

**NOTE:** Employees Hired In The Food Services Department Only, Who Were Full Time Employees In 1977, Shall Continue To Be Considered Full Time Employees And Will Receive Company Paid Benefits As Full Time Employees During The Period Of Their Annual Layoff Subsequent To Park Closing.

**NOTE:** When a full time employee is out on Worker's Compensation, Illness, Vacation, Maternity Leave, etc., and a Seasonal employee is replacing the full time employee, the Seasonal shall receive a minimum flat rate of $9.50 per hour during the Off-Season as described in the contract.

**NOTE:** In the off season a (seasonal) office janitorial classification will be added to the CBA at the starting rate of $9.50 per hour, who will be responsible for cleaning the offices throughout Great Adventure.

## (5)  UNITEHERE LOCAL 54

### ADDENDUM C-2        LOCAL 54 SEASONAL

| DIVISION | JOB TITLE/CLASSIFICATION | BASE DAY 1/1/18 | BASE NIGHT 1/1/18 |
|---|---|---|---|
| **REVENUE** | | | |
| Game | Team Member | $8.60 | $8.70 |
| Attractions | Team Member | $8.60 | $8.70 |
| Merchandise | Team Member | $8.60 | $8.70 |
| Food | Team Member | $9.25 | $9.75 |
| Food | Support | $9.40 | $9.90 |
| Catering | Team Member | $8.60 | $8.70 |
| **OPERATIONS** | | | |
| Admissions | Team Member | $8.60 | $8.70 |
| Rides | Team Member | $8.60 | $8.70 |
| Park Service | Team Member | $8.60 | $8.70 |
| Park Service | RR Attendant | $9.00 | $9.10 |
| Park Service | Midnights | | $9.85 |
| Park Service | Office Janitorial | $9.63 | |
| Parking Lot | Team Member | $8.60 | $8.70 |
| Parking Lot | Bus Driver | $10.23 | |
| **MARKETING** | | | |
| Guest Relations | Team Member | $8.73 | |
| Guest Relations | Lead | $9.13 | |
| Market Research-ATS | Team Member | $8.60 | $8.70 |
| Market Research-ATS | Lead | $8.80 | |
| Entertainment | Team Member/Greeter/Escorts | $8.60 | $8.70 |
| Entertainment | Shows Stage Hand | $8.60 | |
| Entertainment | LT Characters | $8.60 | $8.80 |
| Entertainment | JLA Characters | $10.23 | |
| Entertainment | ST/Atmosphere Characters | $10.23 | |
| Entertainment | Shows Performer/Dancer | $10.23 | |
| Entertainment | Shows Technician | $8.60 | $8.70 |
| Entertainment | Shows Pyro  Technician | $8.60 | $8.70 |
| Wardrobe | Team Member | $8.60 | $8.70 |
| Wardrobe | Seamstress | $8.60 | $8.80 |
| Wardrobe | Laundry | $8.60 | $8.70 |
| | | | |

| **HUMAN RESOURCES** | | | | |
|---|---|---|---|---|
| | **Quick Six** | $8.60 | | $8.70 |
| **SAFARI** | | | | |
| **Safari** | **Gatekeeper** | $8.60 | | $8.70 |
| **Safari** | **Roving Warden** | $8.63 | | |
| **MAINTENANCE** | | | | |
| **Maintenance** | **Water Treatment** | $9.13 | | |
| **Maintenance** | **Landscaping** | $9.13 | | |
| **SORA** | | | | |
| **Explorer Guide** | **Safari Off Road Adventure** | $8.88 | | |
| **Attendant** | **Safari Off Road Adventure** | $8.60 | | $8.70 |

**NOTE 1:** Rehire Incentive -as per Article 13, 13.5(e) (1).

**NOTE 2:** Any Leads established in the above classifications shall receive an additional forty cents ($.40) cent per hour.

**NOTE 3:** In the event the State or Federal minimum wage laws are amended, the parties agree to meet and confer concerning such amendments.

**NOTE 4:** When a full time employee is out on Worker's Compensation, Illness, Vacation, Maternity Leave, etc., and a Seasonal employee is replacing the full time employee, the Seasonal shall receive a minimum flat rate of $9.50 per hour during the Off-Season as described in the contract**.**

**(6)**
# UNITEHERE LOCAL 54
## ADDENDUM D
## LOCAL 54 BENEFIT FUNDS AGREEMENT

In accordance with the terms of the Agreement to which this is attached, specifically Article 22, concerning contributions to the UNITEHERE Health Fund, the National Retirement Fund (NRF), and the UNITE HERE Local 54 Severance Fund, the parties agree to the following:

**1.** Effective January 1, 2018 the Employer agrees to contribute for each full time employee covered by this agreement the sums set forth below, to the UNITEHERE Health Fund, the National Retirement Fund, and the UNITE HERE Local 54 Severance Fund for the purpose of providing health, pension and severance benefits under the UNITEHERE Health Plan, the National Retirement Fund, and the UNITE HERE Local 54 Severance Plan or such new merged or consolidated plans as may be adopted by the Trustees.  Said contributions shall be submitted monthly, together with a report of the employees' data required by the Trust Funds, on the format prescribed by the Trust Funds, no later than the fifteenth (15th) day of the month following the month for which contributions are to be made. This Agreement requires all, or some, eligible employees to pay a portion of the monthly premium through payroll deduction.  As a result, the Employer agrees to specify in their monthly report to the Fund the total amount of contributions being submitted by the employees, the total amount of contributions submitted from the Employer and the total contribution amount.

**2.** The Employer and Union agree to be bound by the Agreements and Declaration of Trusts of the said UNITEHERE Health Fund, the National Retirement Fund, and the UNITE HERE Local 54 Severance Fund as may, from time to time, be amended, and they do hereby irrevocably designate as their respective representative on the Board of Trustees such Trustees named in said Agreements and Declaration of Trusts as Employer and Union Trustees, together with their successors, selected as provided therein, and agree to abide and be bound by all procedures established and actions taken by the Trustees pursuant to said Trust Agreements. Any provision in this Agreement that is inconsistent with the Agreements and Declarations of Trust, or the benefits contained in the UNITEHERE Health Fund Plan, the National Retirement Fund, and the UNITE HERE Local 54 Severance Plan, rules or procedures established by the Trustees, shall be null and void.

**3.** The parties agree that the amount of contributions to be made by both the Employer and the employee to the UNITEHERE Health Fund, subject to the allocations below is as follows:
(i) Effective January 1, 2017, $1,245.86 per month per eligible full-time employee for single coverage; (ii) effective January 1, 2018, $1,320.62 per month, per eligible full-time employee for single coverage; (iii) effective January 1, 2019, $1,320.62 per month, per eligible full-time employee for single coverage; effective January 1, 2020 the Union and the UNITEHERE Health Fund shall notify the Employer of the monthly contribution rate to be effective on January 1, 2020 for the remainder of the agreement, as soon as the rate becomes available. The Employer agrees to accept an increase of up to and including sixteen percent (16%) above the 2019 monthly contribution rate of $1,320.62 per month. If the increase required by the fund for participation in the Plan unit 202 is an increase of sixteen percent (16%) or less above $1,320.62 per month, then the Employer agrees to contribute to such rate and no further agreement will be necessary. The Union and the UNITEHERE Health Fund agree to notify the Employer of any rate decrease to become effective January 1, 2020 and for the remainder of

the agreement between the Union and the Employer, and the parties agree to amend the contact to the decreased rate prospectively. If the UNITEHERE Health Fund increases the monthly contribution rate to be effective on January 1, 2020 plus each subsequent year by more than sixteen percent (16%) beyond the prior contribution level set for the previous year, the parties agree to reopen the Article prior to January 1, 2020 plus each subsequent year for the purposes of negotiating increases in Health contributions to the UNITEHERE Health Fund. The parties agree and understand that should the Article not be reopened, and the appropriate increases paid, the Trustee of the Fund may eliminate benefits to otherwise eligible participants and terminate the Employer's participation pursuant to funds minimum standards. The Employer agrees to submit one check per month to the UNITEHERE Health Fund on behalf of all eligible full-time employees. However, the employees will be responsible for a portion of the UNITEHERE Health contribution. The employees' portion will be deducted from the employee's wages in the form of a payroll deduction. The Employees portion of the contribution effective 1/1/18 will be $89.50 per month for single coverage, as long as the contribution rate increase effective 1/1/20 is not more than 16% above the previous years contribution rate, if the contribution rate is increased by less than 16%, the Employer and Union agree to meet to discuss the reduction in employee contribution commensurate with the decrease in contribution rate below 16%.

**4.**     The Trustees shall not have the power unilaterally to increase the Health contribution rate negotiated by the Employer and Union as set forth above during the life of the Agreement (1/1/18 through 12/31/21). However, while benefits may be adjusted, the Trustees shall not have the power unilaterally to increase the contribution rates negotiated by the Employer and the Union as set forth in the Agreement for the period January 1, 2018 through December 31, 2021.

**5.**     For the purpose of Health, Pension and Severance contributions full time will be defined as employees who are listed as full time by the Employer and Union, regardless of hours worked, on a year round basis. The Employer agrees to provide the Union with a list of all full time employees and agrees to notify the Union of any changes to employee status. Contributions will be made on all full time employees for every month of the year, regardless of hours worked as long as the employee is listed as full time. The Employer agrees to commence Health contributions for all new full time employees upon the earlier of: (a) the first of the month following thirty (30) days of employment or (b) completion of 840 hours of service. For employees who are promoted from a seasonal position to a full time employee, contributions will be made from date of hire as a full time employee, as long as this employee was a seasonal employee in the season immediately prior to being promoted to a full time position. Contributions will be made on all full time employees for every month of the year, regardless of hours worked as long as the employee is listed as full time. For employees who are promoted from a seasonal position to a full time employee, contributions will be made from date of hire as a full time employee, as long as this employee was a seasonal employee in the season immediately prior to being promoted to a full time position.

**6.**     Effective January 1, 2018 , the Employer will contribute for eligible employees who would like to participate in dependent coverage to the UNITEHERE Health Fund the contribution rates as outlined in the UNITEHERE Health Funds Dependent Coverage Policy, currently $55.00 per month. If the UNITEHERE Health Fund determines that an increased contribution is needed, the Employer will increase that contribution up to a maximum of $60.00 per month per eligible employee. Any increase over $60.00 per month per employee will be paid by the employees through payroll deduction. Dependent coverage is optional for employees.

**7.**     The Employer is not required to make contributions and no contributions will be provided for employees who voluntarily waive coverage under the UNITEHERE Health Plan. A waiver of coverage must be on a prospective basis only.  Proof of voluntary waiver must be provided to the Employer.  The Employer is required to keep such proof with the employee's file and such proof shall be made available to the UNITEHERE Health Fund upon request. Absent proof of voluntary waiver of coverage, an eligible employee must be enrolled and contributions paid to the UNITEHERE Health Fund (example of waiver of coverage form attached as Exhibit 1).

**8.**     The parties further agree that an employee may only change his or her enrollment election during the Open Enrollment period of each year of the Agreement which is the month of December, except for newly hired employees, or for employees who have lost coverage under another plan.  Employees who had other coverage, but lost such coverage, may be eligible to enroll in the UNITE HERE Health Plan other than during the normal enrollment period, in accordance with HIPAA or other such applicable law.

**9.**     Effective January 1, 2018, the Employer shall contribute $.75 per hour worked for each full time employee to the UNITE HERE Local 54 Severance Fund up to a maximum of forty (40) hours worked per week.  Contributions to the UNITE HERE Local 54 Severance Fund for new full time employees will be made after 30 days of employment.

Furthermore, effective December 1, 2017, the Employer will contribute $2.33 per hour worked to the National Retirement Fund for all eligible full-time employees. Effective December 1, 2018 the Employer will contribute $2.34 per hour worked to the National Retirement Fund for all eligible full-time employees.  Effective December 1, 2019 the Employer will contribute $2.46 per hour worked to the National Retirement Fund for all eligible full-time employees. Effective December 1, 2020 the Employer will contribute $2.58 per hour worked to the National Retirement Fund for all eligible full-time employees. Effective December 1, 2021 the Employer will contribute $2.71 per hour worked to the National Retirement Fund for all eligible full-time employees.    Contributions will be made to the National Retirement Fund for new employees after 30 days of employment.  Contributions to the National Retirement Fund will be made on all hours worked, up to a maximum of 40 hours per week.

_____          _____

**Six Flags Great Adventure**                    **Service Trades Council Union**

**Dated:_____**                    **Dated:_____**

_____

**UNITEHERE, Local 54**

_____          **Dated:_____**

**UNITEHERE, Local 54**

(7)                    <u>**UNITEHERE LOCAL 54**</u>

# EXHIBIT 1
## <u>WAIVER OF HEALTH COVERAGE</u>

I understand that by signing below I will be waiving my right to have my

Employer, <u>Six Flags Great Adventure,</u> make contributions on my behalf to the

UNITEHERE Health Fund.  My signature indicates that I will NOT BE

COVERED under the UNITEHERE Health Plan.

I understand that by signing this waiver, I will not be able to re-enroll except

during open enrollment periods or other times as permitted by federal law.

I am in agreement with the above.

NAME: _____
                     (Print Name)

SIGNATURE:_____

DATE:_____

\* This form must be kept in the employee's file and made available to the UNITEHERE
HEALTH Fund upon request.
**Special Enrollment Right:**
If you are declining enrollment for yourself or your dependents (including your spouse)
because of other health insurance coverage, you may in the future be able to enroll yourself or
your dependents in this plan, provided that you request enrollment within 60 days after your
other coverage ends.  In addition, if you have a new dependent as a result of marriage, birth,
adoption, or placement for adoption, you may be able to enroll yourself and your dependents,
provided that you request enrollment within 60 days after the marriage, birth, adoption, or
placement for adoption.

**(8)**       **UNITEHERE LOCAL 54 and SERVICE TRADES**

**ADDENDUM E**

**SIX FLAGS GREAT ADVENTURE**
**DRUG AND ALCOHOL**
**TESTING POLICY**

**I.       POLICY**

It is the policy of SIX FLAGS GREAT ADVENTURE ("Six Flags") to maintain a work environment free of drugs and alcohol.  Employees are strictly prohibited from using, transferring, possessing, selling, manufacturing, distributing, or being under the influence of illegal drugs, controlled substances, or alcohol during working hours or while on Six Flags property.  Employees who violate this Policy are subject to discipline, up to and including termination.

This Policy applies to all of Six Flags' Employees covered under the Company's collective bargaining agreement to which this policy is attached.  All new and current Employees under the coverage of this policy are required to participate in Six Flags' Drug and Alcohol Testing Program, which will provide information on the dangers of workplace drug use; the policy of Six Flags as set forth herein including penalties; and available drug counseling, rehabilitation, and Employee Assistance Programs (EAPs) in the community.  All Employees must comply with this Policy as a condition of continued employment.

**II.       PURPOSE**

To take reasonable steps to ensure the safety of guests, Employees, and the public; to ensure that no Six Flags Employee works while impaired by drugs or alcohol; and to encourage Employees to seek counseling and treatment for drug and/or alcohol abuse.

**III.  PROCEDURE**

      **A.       PROHIBITED ITEMS AND**
              **SUBSTANCES**

The items and substances covered by this Policy include:

**1.**       Illegal drugs, controlled substances, "look-alike" substances, inhalants, prescription drugs that have not been authorized as set forth below, alcohol, or any other substance capable of altering the mood, perception, pain level, or judgment of the individual using it.

**2.**       Equipment, paraphernalia, or other items or material related to illegal drug use or substance abuse.

**3.**       Alcoholic beverages (including having the odor of alcohol on the breath).

**B.     PRESCRIPTION DRUGS**

Employees may maintain prescription drugs on Six Flags premises provided the following conditions have been met:

**1.**     The drugs have been prescribed by a doctor <u>for the person in possession of the drug;</u>

**2.**     The drugs are kept in their original container; and

**3**.     Any Employee who is taking a legal drug or medication which may adversely affect the employee's ability to perform work in a safe manner is required to report such use to the Human Resources Department to determine whether the Employee is able to safely perform the Job.  The Employee should not disclose the medical condition for which the drug is being taken, but need only identify the drug being taken.  Upon request, Employees shall provide a Doctor's note certifying that they are able to work while taking the prescribed drug(s).

**C.     COOPERATION WITH LAW
         ENFORCEMENT AND
         LICENSING AGENCIES**

Six Flags is committed to providing the best possible service to our guests and a safe, drug-free workplace for our Employees.  Since violations of this Policy may also constitute criminal activity, Six Flags shall:

**1.**     Notify the appropriate law enforcement agency or agencies whenever anyone on Six Flags premises or on working time is suspected of possessing, selling, transferring, or stealing any of the prohibited items or substances covered by this Policy.

**2.**     Cooperate fully with the appropriate law enforcement agency or agencies in the detection, investigation, arrest, and prosecution of anyone engaged in the activities, which are prohibited by this Policy.

**3.**     Cooperate fully with any licensing or certifying agency in their investigation and discipline of anyone suspected of violating this Policy.

**D.     VOLUNTARY TREATMENT AND EMPLOYEE ASSISTANCE
         PROGRAM**

Six Flags encourages every Employee to voluntarily obtain treatment, counseling and rehabilitation whenever he/she feels they have a problem with alcohol and/or drugs.  Time off for treatment up to 30 consecutive calendar days will be given without pay.  All earned vacation or sick time must be taken before using unpaid leave.  Additional leave may be granted at the discretion of Six Flags.  Costs of treatment will be borne by the Employee and/or by the limits of his/her health insurance policy.

**1.**     Employees participating in a rehabilitation program who continue to work at Six Flags must continue to meet existing job performance standards. Nothing in this Policy will constitute a waiver of Six Flag's right to take disciplinary action in the case of poor performance, poor attendance or misconduct.

**2.**     As a term of continued employment, Employees must also:

**a.**     Follow all recommendations made by Six Flags or any other treating facility/professional.

**b.**     Sign all forms incidental to receipt of rehabilitative services.

**c.**  Attend and complete any and all rehabilitation programs to which the Employee is referred.

**d.**     Furnish proof, on a periodic basis, that he/she is attending all recommended programs and/or receiving all recommended treatment.

**e.**     Submit to periodic unannounced substance testing at the discretion of Six Flags for a period of one (1) year as part of rehabilitative treatment and maintenance.

**3.**     Six Flags may, in its discretion, impose additional requirements as a condition to the receipt of a rehabilitative leave and/or return to work.

**4**.     In those cases where an Employee's substance abuse problem or participation in a treatment program results in the suspension or revocation by any licensing agency of an Employee's license (e.g., driver's license) which is incidental to the performance of his/her required duties, Six Flags, in its sole discretion, may find another position for the Employee.

**5.**     Employees who fail to follow the above conditions, or come to work under the influence of alcohol or any substance prohibited by this Policy, test positive for any substance prohibited by this Policy, or otherwise violate any provision contained in this Policy, shall be terminated from employment immediately.

**6.**     Six Flags will establish an Employee Assistance Program ("EAP"), which will train Employees, supervisors and Company officials regarding the effect and consequences of controlled substance use.

### E.     WHEN A TEST WILL BE CONDUCTED

**1.**     Testing When Filling Full-Time and Supplemental Positions: Testing may take place when Six Flags is filling a full-time position, including when Six Flags is transferring, reassigning, or otherwise moving an individual from a supplemental maintenance or seasonal position to a full-time position.  Testing may also take place when Six Flags is filling a supplemental maintenance position.

**2.**     Reasonable Suspicion Testing for Drugs or Alcohol: Testing may take place when Six Flags has a reasonable suspicion that an individual is under the influence of drugs or alcohol.

"Reasonable suspicion testing" may be initiated when at least one trained supervisor or Company official has observed actions, appearance or conduct indicative of the use of a controlled substance or of the violation of Six Flag's Policy.  Reasonable suspicion is drawn from specific objective and articulable facts and may be based upon the following:

**(a)**     Observable phenomena, such as direct observation of drug/alcohol use and/or the physical symptoms or manifestations of being under the influence of drugs or alcohol.

**(b)**     Abnormal conduct or erratic behavior while at work, absenteeism, tardiness, or deterioration in work performance.

**(c)**     A report of drug or alcohol use provided by a reliable and credible source.

**(d)**     Information that an Employee has caused or been involved in an incident which, under objective standards and in light of the nature of Six Flag's business, indicated that the Employee may have been impaired by the use of or under the influence of a prohibited item or substance.

**(e)**     When an Employee is found in possession or control of drugs or substances prohibited under this Policy, or drug paraphernalia.

Six Flags will ensure that the Employee being tested for reasonable suspicion is taken immediately to a designated collection site and that the Employee's blood and/or urine sample will be transported to a certified testing laboratory. The company official(s) witnessing the incident giving rise to the testing must file a report within 24 hours indicating the basis for the suspicion. Any Employee who refuses to be tested or tests positive on a confirmed test will be discharged.

**3.** Random Testing: Selection for random testing shall be made utilizing a computer generated random number selection method.

### F.     TESTING AFTER A POSITIVE TEST

If an Employee tests positive for drugs or alcohol, Six Flags may either terminate the Employee immediately or, in appropriate circumstances and in Six Flag's sole discretion, the Employee may be offered the opportunity to seek rehabilitation under the terms and conditions set forth in paragraph D of this Policy.

### G.     HOW THE TEST WILL BE CONDUCTED

**1.**     When a Supervisor and/or Company Official determines that testing is warranted, the Employee will be escorted to an approved testing facility and will be tested in accordance with their procedures.

**2.**     The Employee will be asked to sign a consent form authorizing the drug/alcohol test. Refusal to sign the consent form or to submit to a test shall be considered an admission of a violation of this Policy and may result in discipline, up to and including termination.

**3.**     The Employee will be asked to remove any unnecessary outer garments, such as a coat or jacket that might conceal items or substances that could be used to tamper with or adulterate the individual's urine specimen.

**4.**     The Employee will be asked to provide a 60 milliliter urine sample, which will be placed in three (3) tamper-resistant specimen containers.

**5.**     The collection of urine specimens shall allow for individual privacy unless there is reason to believe that a particular individual may alter or substitute the specimen to be provided.   Whenever there is reason to believe that a particular individual may alter or substitute the specimen to be provided, a second specimen shall be obtained under the direct observation of a same gender medical professional (e.g., physician, nurse, laboratory technician).

**6.**     The Employee will be asked to read and sign a statement certifying that the specimen identified as having been collected from him or her is in fact that specimen he/she provided.

**7.**     The Employee will be given an opportunity to provide any information that he/she considers relevant to the test, including identification of currently or recently used prescription or nonprescription drugs, or other relevant medical information.   The submission of this information shall not preclude the administration of the drug test, but shall be taken into account in interpreting any positive confirmed results.

**8.**     All specimens identified as positive on the initial test shall be confirmed through the use of a gas chromatography/mass spectrometry test ("GC/MS test").

**9.**     If the confirmatory test is positive, the Employee may, if he/she wishes, request that the third specimen be tested for confirmation through the use of a GUMS test.  In such a case, the Employee shall bear the cost of the second confirmatory test.

**10.**     Six Flags shall inform an Employee in writing of positive test results.   A confirmed positive test shall result in discipline, up to and including termination of employment.

**11.**     Six Flags shall pay the cost of all drug tests, except a second confirmatory test requested by the Employee.

**12.**     In the event an employee is terminated or suspended on the basis of a false test result, the Company shall reinstate said employee with full back pay.

### H.     WHERE THE TEST WILL BE CONDUCTED/LABORATORY REPORTS

**1.** All tests shall be conducted by an independent testing laboratory.

**2.** The laboratory shall submit to Six Flags a written test result report, and shall maintain a strict chain of custody for all samples.

**3.** Test results shall remain confidential to the extent practical, and shall not be disclosed except on a strict need-to-know basis.

**4.** Test results shall be maintained in separate medical files.

## STATEMENT TO BE SIGNED PRIOR TO DRUG OR ALCOHOL TEST

STATE OF AUTHORIZATION FOR MEDICAL COUNTY OF EXAMINATION, and URINALYSIS DATE AND/OR WITHDRAWAL OF BLOOD SPECIMEN(S) FOR DETERMINATION OF DRUG CONTENT and CONSENT TO DISCLOSE MEDICAL INFORMATION, and RELEASE FROM ALL LIABILITY

I, _____, authorize (applicant or employee) (medical facility or physician) to perform a medical examination, and conduct a urinalysis and/or withdraw a specimen(s) of my blood for the purpose of chemical analysis to determine the drug or alcohol content thereof I authorize the release of the results of these tests to SIX FLAGS GREAT ADVENTURE or its designated representatives.

I hereby release SIX FLAGS GREAT ADVENTURE, all entities or individuals performing the tests, and all entities or individuals disclosing or receiving the results of the tests from any and all claims or liabilities that may arise out of these tests or the disclosure of test results.

I understand and agree that any such test is not a diagnostic examination designed to detect any disease or illness, hidden or latent, but is instead for the purpose of determining drug use/content, and to ascertain my fitness and safety to perform the job.  I understand and agree that neither SIX FLAGS GREAT ADVENTURE, nor any examining physicians or medical personnel, shall be liable for injury or suffering experienced by me as a result of physical or mental infirmities, disease, or conditions not detected during the course of the physical examination, or for failure to direct me to a specialist for treatment.

I acknowledge that I have read this Authorization and Release and signed it voluntarily. I also acknowledge that I have had the opportunity to ask questions about statements made in this document, and that the questions that I have asked, if any, have been answered to my satisfaction.

Name:_____

Signature Date:_____

Print Name:_____

**(9)**

**ADDENDUM F**
**SERVICE TRADES COUNCIL AFFILIATE BENEFIT FUNDS**

UNITEHERE HEALTH Fund
P.O. Box 6020
Aurora, IL 60598-0020

National Retirement Fund
6 Blackstone Valley Place, Suite 302
Lincoln, RI, 20865-1112

Local 54 Severance c/o
Frank Vaccaro & Associates Inc.
27 Roland Ave, Suite 200
Mount Laurel, N.J., 08054

New Jersey Carpenters' Fund
Raritan Plaza II
P.O. Box 7818
Edison, NJ 08818-7818

I.B.E.W. Local #400
P.O. Box 1256
Wall, NJ 07719

National Electrical Benefit Fund
P.O. Box 1081
Mountainside, NJ 07092

Iron Workers Local #68 Funds
Welfare Retirement Pension Fund
2595 Yardville-Hamilton Square Rd.
Trenton, NJ, 08690

Laborers Local 77
New Jersey Building Laborers Statewide Funds
3218 Kennedy Boulevard
Jersey City, New Jersey 07306-3416

**ADDENDUM F**
**SERVICE TRADES COUNCIL AFFILIATE BENEFIT FUNDS**


IU Bricklayers and Allied Craft Workers ADC NJ, Local 4 and 5
14 Plog Road
Fairfield, N.J., 07004

Painters District Council 711 Benefit Fund c/o
Frank Vaccaro & Associates Inc.
27 Roland Ave, Suite 200
Mount Laurel, N.J., 08054

Local 825 funds address
65 Springfield Ave.
Springfield N.J., 07081

Sheet Metal Workers' International Ass.
Local Union # 27
Administrative & Fund Office
P.O. Box 847
Farmingdale, N.J., 07727

Teamsters Local Union No. 469
Benefits Funds
3400 Highway 35 Suite 8
Hazlet, N.J., 07730


United Association of Plumbers & Pipefitters Local 9
Plan Administrators
 IE Shaffer & Company
830 Bear Tavern Rd.
West Trenton, NJ 08628-1020
(800) 792-3666
(609) 883-6688
Fax# (609) 530-1331

**(10)**

## SERVICE TRADES
## ADDENDUM G
### NEW CONSTRUCTION PROJECT
### LABOR AGREEMENT

The terms of this Project Labor Agreement shall apply to all contractors performing new construction work on all entertainment attractions and/or facilities or other structures at the Ocean and Monmouth County property of Six Flags Great Adventure (the "Complex")

**WHEREAS,** the contractor listed below ("Contractor") is an employer engaged in the building and construction business;

**WHEREAS,** the Contractor desires to perform new construction work at Six Flags Great Adventure;

**WHEREAS,** the Contractor is required by the parties' Agreement to employ employees represented by the local unions affiliated with the STC in order to perform such work; and

**WHEREAS,** the STC affiliates shall provide said employees to the Contractor;

**NOW, THEREFORE,** the Contractor and the STC agree that with respect to employees provided to the Contractor by the STC:

**1.**     The Contractor shall pay employees ninety (90%) of the outside wage rate and one hundred percent (100%) of the outside benefit rate that are in effect at the time of the new construction project as set forth in the applicable current collective bargaining agreements of the STC union affiliates for construction projects within the immediate geographic vicinity of Six Flags Great Adventure. Any work starting after 2:30pm will be considered the second shift, and the contractor will pay (95%) of the outside wage rate and (100%) of benefits for new construction for second shift. Maintenance personnel will be paid ninety (90%) of outside wage and one hundred (100%) of the outside benefit rate when work is required for the first or second shift on new construction projects.

**2.**     If the Contractor enters into a subcontract in connection with any construction project covered by this Agreement, the Contractor shall include in any such subcontract a requirement that the subcontractor, of whatever tier, become signatory to and be bound by this Agreement with respect to all new construction work the subcontractor performs on such project.

**3.**     The Contractor and the Union shall fully comply with all relevant terms and conditions of employment contained within the Agreement between SIX FLAGS GREAT ADVENTURE and the STC, including Article 6, Work Stoppages and Lockouts, except that the Trades' affiliates may withhold labor from the Contractor for the failure to pay wages or benefits. The signatory unions agree not to engage in slowdowns, featherbedding, or interference with deliveries of equipment, apparatus, machinery and construction materials by vendors and suppliers in connection with project work. Each Trade affiliate shall be permitted to unload its own deliveries.

4.     The local unions shall provide an adequate and skilled supply of qualified employees to meet the requirements of the Company and any contractor, as the case may be.  Prior to commencement or during the course of any New Construction Project, the Company or a contractor may request manpower from the local unions.  Within twenty-four (24) hours, the unions shall respond to the Company or to the contractor, as the case may be, whether they can supply them with an adequate supply of qualified employees to meet the requirements of the Company or the contractor.  If the unions indicate to the Company or to any contractor that they are unable to supply adequately skilled and qualified employees, the affected contractor or the Company, as the case may be, shall have the immediate right to hire or use employees from any source.  If the Union is unable to fulfill the labor requirements for specific classifications requested by the Company or by the contractor within forty-eight (48) hours (excluding Saturday, Sunday, and holidays) after the request, the Company or the contractor shall have the right to hire or use employees from any source.

5.     Except as otherwise provided herein, and in the collective bargaining agreement between Six Flags Great Adventure and the Service Trades Council Union ("STC"), the Contractor is, or if not, shall become signatory to and shall be bound by the applicable current collective bargaining agreement of the following STC union affiliates for construction projects within the immediate geographic vicinity of Six Flags Great Adventure:

IU Bricklayers and allied Craft Workers ADC NJ, Local 4 and 5
Carpenters and Millwrights Local 255*
Construction and General
Laborers' Union Local 172
Electricians Local 400
Iron Workers Local 68
Laborers Local 77
Operating Engineers Local 825
Painters District Council 711
Plumbers and Pipefitters Local 9
Sheet Metal Workers Local 27
Teamsters Local Union # 469

With respect to Teamsters Local 469, the past practice of SIX FLAGS GREAT ADVENTURE and the Service Trades Council shall govern Teamsters Local 469 work on projects covered under this Project Labor Agreement.

*If the Company requires Millwrights, it shall first contact Local 255 to supply same. Local 255 shall contact Local 715 to refer Millwrights to the Company.  This agreement is applicable only to new construction.
Where a subject covered by the provisions of this Agreement is also covered by the foregoing Local Collective Bargaining Agreements, the provisions of this Agreement shall prevail.

6.     The agreements and declarations of trust as amended, governing the above-mentioned benefit funds are agreed to by and between the Contractor and the STC and are incorporated herein by reference.

**7.** Except as otherwise provided herein, the Contractor and the STC shall be bound by all other jurisdictional rules and working conditions as are contained in the current Collective Bargaining Agreements of the STC Union affiliates for construction projects within the immediate geographic vicinity of Six Flags Great Adventure. Where a subject covered by the provision of this Agreement is also covered by the Local Collective Bargaining Agreements, the provisions of this Agreement shall prevail.

**8.** There will be no strikes, picketing, work stoppages, slowdowns, or any other disruptive activity or interference of any kind or interruption of work arising out of any jurisdictional dispute relating to the construction project covered by this Project Labor Agreement. Pending the resolution of any such dispute, work shall continue uninterrupted and as assigned by the Contractor. Any union having a jurisdictional dispute with respect to Project work assigned to another union will submit the dispute to the president of the STC and send a copy of the letter to the other union involved the Contractor, and the SIX FLAGS GREAT ADVENTURE project manager. Within 24 hours of receipt of the dispute letter, representatives of the affiliated locals of the STC and representatives of the local unions involved, the Contractor and the project manager will meet for purposes of resolving the jurisdictional dispute. In the event that the parties to the dispute are unable to agree on a resolution, the dispute shall be referred to expedited arbitration before Arbitrator J. J. Pierson in accordance with the terms of Article 6, Section 6.5 of the collective bargaining agreement between SIX FLAGS GREAT ADVENTURE and the STC. If J. J. Pierson is unavailable, a different arbitrator shall be designated in accordance with the terms of Article 6, Section 6.5 of such collective bargaining agreement. The decision of the arbitrator shall be final and binding. The fees and expenses of such arbitration proceeding shall be shared equally by each union and the involved Contractor.

**9.** The Contractor shall checkoff all dues monies as are required by the affiliate Unions of the STC provided said employees properly authorize said deductions.

**10.** The following additional rules and working conditions shall apply to the new construction project covered by this Agreement:

**(a)** Subject to mutual agreement between the STC and the Company, the Contractor may establish a seven (7) day work week consisting of four (4) 10-hour days. The work week shall consist of four (4) consecutive 10-hour work days Monday through Thursday, including a one-half hour unpaid meal period, at the regularly established hourly rate. All work performed beyond ten (10) hours on the four (4) day work week will be paid for at one and one-half (1-1/2) times the regularly established hourly rate. Each employee shall receive three (3) consecutive days off. If an employee works any of the three (3) days, he shall receive one and one-half (1-1/2) times the regularly established hourly rate for work performed, except for work performed on Sundays and Holidays, which shall be paid at double (2) time. If the Contractor exercises this option, it is agreed that the minimum duration of this schedule will be seven (7) consecutive days. Within the concept of four (4) 10-hour day workweek, a second shift may be established Monday through Thursday. The determination of whether to institute multiple shifts and the timing thereof shall be within the discretion of the Contractor.

**(b)** There shall be only one meal break on any 8-hour or 10-hour shift.

57

**(c)**     The recognized holidays shall be the following:
New Year's Day
Memorial Day
July 4
Labor Day
Veterans' Day
Thanksgiving
Christmas
Election Day (Presidential election only)

**(d)**     Because SIX FLAGS GREAT ADVENTURE maintains an in-house maintenance staff, electricians for temporary power are not needed when an in-house maintenance electrician is on duty at SIX FLAGS GREAT ADVENTURE.

**(e)**     When SIX FLAGS GREAT ADVENTURE is the Contractor or General Contractor on any project, any employee terminated or laid off for lack of work and not directed to report back to work within the particular workweek shall receive all monies due him/her for hours worked, and accrued benefits, no later than the next regularly scheduled payday after the termination or layoff.

**11.**     The Contractor, as a condition of accepting any bid for new construction work at Six Flags Great Adventure, agrees to fully abide by all the conditions of this Project Labor Agreement and any failure to comply with this Project Labor Agreement may result in the invalidation of the award of the construction project by SIX FLAGS GREAT ADVENTURE or the termination of the construction project prior to its completion. Service Trades will provide "outside wages and outside benefits" rates as of 1/1/2018, 1/1/2019, 1/1/2020 and 1/1/2021 or as the rates change.

It is hereby agreed this _____day of, _____, _____.


SERVICE TRADES COUNCIL UNION
CONTRACTOR
By: Name: _____
Sam Rubino, President STC

Address:_____

Telephone: _____

Signature:_____

By: _____

Name:_____
IRS ID#:_____

**(11)**                        **SERVICE TRADES**

**Exhibit G Letter of Assent**

TO: Service Trades Council
Post Office Box 1256
Wall, New Jersey 07719

Re:

Subject: Project Labor Agreement
Gentlemen:

We have reviewed the above-referenced Project Labor Agreement and the applicable Local agreement(s) for the crafts we will be employing on this site in connection with this new construction project.

This letter constitutes our acknowledgement and acceptance of the jurisdictional rules and working conditions of those agreements for the duration of our contract work at the above-referenced site in connection with this new construction project.   By signing this letter of assent, we agree to be bound for the duration of our contract work at the above referenced site by the provisions of the Project Labor Agreement, the applicable local labor agreement (as modified by the Project Labor Agreement), and the agreements and declarations of trust as amended, governing the benefit funds set forth in Addendum F of the collective bargaining agreement between Six Flags Great Adventure and the Service Trades Council Union.

We stipulate that any subcontractor of ours, of whatever tier, performing work covered by the Project Labor Agreement will also sign this letter of assent for the performance of their subcontract.

The following crafts will be employed:

_____

_____

_____

Sincerely yours,
Owner or Corporate Officer

cc: Local Union(s)

**(12)**

# ADDENDUM H
# UNITEHERE LOCAL 54

LOCAL 54 GRIEVANCE FORM

(ON SIX FLAGS GREAT ADVENTURE STATIONARY)

TO:

FROM:

DATE:

SUBJECT:

Please accept this letter as the written response to the grievance filed by on.
(name of Local 54 Grievant)(date)


Summary of Hearing/Reason for Disciplinary Action:


Details of Hearing:


Findings of Hearing/Management's
Response:



Christine Parker, Director of Administration
SIX FLAGS GREAT ADVENTURE

**(12A)**                     **ADDENDUM H**
                    **UNITEHERE LOCAL 54**

 **Article 18:     GRIEVANCES PROCEDURE FOR LOCAL 54**

**1.**     Any violation of this agreement shall be resolved by utilization of the following
method:

     **(a)**     Step 1:  The employee and or the shop steward shall first attempt to resolve
his/her grievance with the department head, except for disciplinary grievances, which will go
directly to Step 2 below.

     **(b)**     Step 2:  In the event the grievance is not resolved at Step (a) above, the
employee must file a written grievance with the Union.  Said written grievance shall be
submitted for resolution to the Employer's Human Resources Representative no later than ten
(10) calendar days after the grievance arises or within seven (7) days of the outcome of the
Step 1 meeting, whichever is later.

     **(c)**     Step 3:  If not otherwise resolved, the Employer shall conduct a meeting to
resolve the grievance within fourteen (14) calendar days of receipt of the grievance unless the
time period is mutually agreed to be extended.  A written decision will be rendered to the
Union within seven (7) calendar days of the date of the meeting.

**2**.     If the dispute is not resolved at the meeting, timely grievances may be submitted to
arbitration.  A request for arbitrators must be submitted to the American Arbitration
Association with a copy to the Employer in writing within twenty-one (21) calendar days of the
Employer's decision.  During the twenty-one (21) day period the parties may agree to use a
mutually selected arbitrator.

**3.**     The following shall apply to arbitrations:

     **(a)** The cost of the arbitrations will be borne equally by the Union and the Employer.

     **(b)** The arbitrator shall have no authority to alter, amend, add to, subtract from, or
          otherwise change the terms and conditions of this Agreement.

**(c)** The decision and award of the arbitrator shall be final and binding on the Parties.

**4.**     Failure to meet the time limits contained in this Article shall cause the grievance to be irrevocably resolved against the Party missing the time limit.

**5.**     The Parties may agree to allow grievances to be heard in front of a mutually agreed upon individual with agreement by both parties. The Parties agree to have the decisions binding.

**(13)**

## ADDENDUM I (1)
## SERVICE TRADES
### SIDE LETTER OF INTERPRETATION

Sam Rubino
President, Service Trades Council
P.O. Box 1256
Highway 38
Wall, New Jersey 07719

Dear Mr. Rubino:

During the recent contract negotiations giving rise to the Agreement between SIX FLAGS GREAT ADVENTURE and the SERVICE TRADES COUNCIL dated as of January 1, 2018, both parties have made an effort to respond to the reasoned and reasonable concerns of the other.  For example, the parties have had meaningful discussions with respect to the Company's desire for efficiency and productivity, and have had meaningful discussions with regard to the Union's concern about subcontracting issues.  In the spirit of minimizing future disputes between the parties, the Company and the Union set forth the following understandings:

**1.**     The Company and Union agree that it is in the mutual best interests of both parties to promote the efficient operation of the Park.  To further the goals of promoting efficiency, the Union and the Company agree that, in addition to provisions of Article 15 of the Agreement, employees also may be assigned maintenance work outside their normal craft jurisdiction if such work involves minor assignments that do not exceed two (2) hours on any project and provided that such assignments do not result in the layoff, failure to recall from layoff, or failure to hire a full-time employee when another full-time employee terminates employment or retires.  The Company has informed the Union it will discuss any problems with the Union with regard to any such assignments and that the Union and the Company have agreed that the President or Secretary/Treasurer of the STC or the Company may cancel any minor assignment at any time.

**2.**     The Union and the Company agree that the expansion on an existing structure, operation or facility that is less than thirty percent (30%) of the square footage of such structure, operation, or facility, and less than 1,000 square feet in total, shall be considered maintenance under the terms of the Agreement and not New Construction. New Construction rates outside the scope of the above definition will be applied when the capital funding is allocated for new Electrical service and such project exceeds $ 50,000.00 in labor & materials per project.  This includes projects such as, but not limited to, installation of CCTV's and scrolling signs.

**3.**     Consistent with and to preserve past practice, and subject to Article 28 if maintenance work covered by this Agreement relating to the alteration, painting, and repair of existing structures is subcontracted by the Company, it shall be subcontracted to a contractor who is a union signatory or to a contractor who executes the Project Labor Agreement attached as Addendum G to the Agreement, in the Company's discretion.  The Union and the Company agree that the Company may subcontract some or all of such work, and may use its full-time maintenance employees or supplemental maintenance employees on any portion of such maintenance work that is not subcontracted.
Sincerely,

By: _____          By: _____
    Neal Thurman                                   Sam Rubino, President STC

**(14)** 
## ADDENDUM I (2)
## UNITEHERE LOCAL 54
## CONCESSIONAIRES SIDE LETTER

For the term of the contract only, January 1, 2018 - December 31, 2021, and without in any way altering or amending the description of the bargaining unit as set forth in the collective bargaining agreement, the Company may, as an experiment and trial, enter into agreements with national brand, fast food concessionaires who will not be subject to the concessionaires recognition clause of the Agreement, provided that the Company may not have more than three (3) of such concessionaires, each limited to a single location, at any one time during the term of the Agreement and provided further that the following conditions are met:

**1.** All other concessionaires shall continue to be covered by the Agreement and be required to execute Addendum A.

**2.** The Company will guarantee that the number of bargaining unit employees covered by Local 54 will not fall below the average number of such employees (as calculated over the term of the three year collective bargaining agreement that expired December 31, 1996) solely as a result of the trial fast food concessionaires. This provision shall not in any way limit the Company's rights under Article 5 of the Agreement. The measuring dates shall be the first (1st) day of each month between April and October of each year.

**3.** This side agreement shall expire and be null and void on December 31, 2021. It shall not be used as evidence before any agency, court of law or arbitrator concerning or affecting the description of the contractual bargaining unit (which bargaining unit shall remain unchanged), except in a proceeding to determine and interpret the meaning and application of this side agreement.

**4.** In the event of a dispute as to the application or interpretation of this side agreement, the undersigned parties agree to the expedited submission of the dispute to an arbitrator designated in accordance with the expedited rules of arbitration for the New Jersey State Board of Mediation. Such hearing shall take place within thirty (30) days of submission to the New Jersey State Board of Mediation and the decision of such arbitrator shall be final and binding. The cost of the arbitrator shall be borne equally by the parties.

The Service Trades Council and its affiliate members agree that for the term of the Agreement, they shall not engage in any organizational or recognition activity of any kind concerning the employees of the concessionaires referred to herein, nor shall they file any election petition with the NLRB or demand recognition as the bargaining agent of such concessionaires, or encourage or facilitate any of the foregoing.

SERVICE TRADES COUNCIL UNION          SIX FLAGS GREAT ADVENTURE:

_____          _____

Sam Rubino                                            Neal Thurman

**(15)**

**ADDENDUM I (3)**
**SERVICE TRADES**
**Side Letter**

Sam Rubino
President
Service Trades Council
P.O. Box 1256
Highway 38
Wall, New Jersey 07719

Dear Mr. Rubino:

During the recent contact negotiations giving rise to the Agreements between Six Flags Great Adventure and the Service Trades Council dated as of January 1, 2018, both parties have made an effort to respond to the reasoned and reasonable concerns of the other.  For example, the parties had meaningful discussions with respect to the Company's practice of using composite crew under limited circumstances and the allowable work performed by vendors on Park property. In the spirit of minimizing future disputes between the parties, the Company and the Union set forth the following understands:

1.     The Company and the Union agree that it is in the mutual best interest of both parties to promote the efficient operation of the Park.  To further this goal, the Company and the Union agree that the Company and upon notice to the appropriate business agents, may continue its past practice of utilizing composite crews to complete non-skilled tasks, which by way of example shall include set-up of show stages and props, set-up and take down of tents for special events, and clean-up work not related to new construction.

2.     The Company and the Union agree that, upon notice to the appropriate business agent and on a case by case basis, vendors shall be permitted to perform up to 4 hours work on special projects such as tent set-up and specialized electronic work.

Sincerely,

By: _____
     Neal Thurman


Service Trade Council Union

By: _____
     Sam Rubino

**(16)**                                   **UNITEHERE LOCAL 54**

### ADDENDUM J UNITEHERE LOCAL 54

**PAYROLL DEDUCTION FOR SUPPLEMENTAL INSURANCE**

The Employer agrees to provide payroll deduction for voluntary supplemental insurance, provided by a company that the Union designates.

The Employer further agrees to provide meeting space for enrollment of voluntary supplemental insurance no less than one (1) time per year for a period of 30 days designated by the Union.

**(17)**

# ADDENDUM K
# UNITEHERE LOCAL 54
### SUPPLEMENTAL AGREEMENT

### NATIONAL RETIREMENT FUND

This SUPPLEMENTAL AGREEMENT (the "Agreement") is made as of _____,_____, by and among **Six Flags Great Adventure and Wild Safari** (the "Employer"), **UNITE HERE Union Local 54** (the "Union"), and the National Retirement Fund (the "Fund").

W I T N E S S E T H:

WHEREAS, the Employer and the Union have heretofore executed a collective bargaining agreement with respect to the Employer (the "Collective Bargaining Agreement");

WHEREAS, as part of the consideration for the execution, renewal and/or extension of the Collective Bargaining Agreement by the Union, the Employer agreed to contribute sums of money to the Hotel Employees and Restaurant Employees International Union Pension Fund ("HEREIU Pension Fund");

WHEREAS, as a result of a merger of the HEREIU Pension Fund into the Fund, effective as of September 30, 2007, the Fund is a successor to the HEREIU Pension Fund; and

WHEREAS, as part of the consideration for the execution, renewal and/or extension of the Collective Bargaining Agreement by the Union, the Employer agreed to enter into a supplemental agreement in the form of this Agreement.

NOW, THEREFORE, in consideration of the covenants and conditions set forth herein, the parties agree that the Collective Bargaining Agreement shall be supplemented as follows:

1. Participation; Trust Agreement.

    a. Effective September 30, 2007, the Employer shall become a participating Employer in the Fund (a "Participating Employer").

    b. By participating in the Fund, the Employer shall be a party to the Agreement and Declaration of Trust of the National Retirement Fund, as amended (the "Trust Agreement"), which established the Fund as a jointly administered Union-Management trust fund to provide benefits (in accordance with a written pension plan incorporated herein by reference) for employees of Participating Employers.  To the extent the terms and conditions of this Agreement are inconsistent with the terms and conditions set forth in the Trust Agreement, the terms and conditions of the Trust Agreement shall control.

2.  Contributions; Employee Participation.

    a.  Commencing as set forth in the current Collective Bargaining Agreement, between the Union and the Employer, the Employer shall pay at the rate set forth in the Collective Bargaining Agreement, an amount per eligible employee who is a member of the bargaining unit covered by the Collective Bargaining Agreement (the "Contributions").  Such contributions shall be submitted monthly no later than the fifteenth (15th) day of the month following the month for which contributions are to be made.

    b.  The contributions shall be payable to the "National Retirement Fund" and shall be remitted to the office of the Fund.

    c.   The Employer shall furnish with the Contributions (or upon request) such information and/or reports, in such form and manner as required by the Trustees of the Fund, which may include the names of the Employer's employees, their Social Security numbers, the hours worked by each employee (including employees not covered by the Fund's plan of benefits as the Trustees may reasonably require), paid hours, unpaid hours, vacation, sick leave and such other information as the Trustees may require in connection with the administration of the Fund (the "Contribution Reports").

    d.  The Employer further agrees to provide written notice within thirty (30) days after any of its employees participating in the Fund (i) dies, (ii) is terminated from employment, or (iii) otherwise ceases to be eligible to participate in the Fund.

3.  Collection by the Fund.

    a.  In addition to any remedies to which the Union or the Fund may be entitled, if the Employer (i) is in default in its Contributions for one (1) or more months, (ii) is delinquent in submitting a Contribution Report and/or submits an inadequate Contributions Report to the Fund for one (1) or more months, (iii) refuses to permit the Fund to conduct an audit, and/or (iv) is shown by an audit to owe Contributions and/or Contribution Reports to the Fund; the Trustees of the Fund or the Fund Administrator may commence against the Employer, or any other individual or entity that may be liable to the Fund for the Contributions, an action in court or an arbitration (in accordance with Paragraph 4 herein).

    b.  In the event the Fund commences against the Employer (or other individual or entity) an action in court or an arbitration as set forth in Paragraph 3(a), the Employer (or other individual or entity) shall be liable to the Fund for all costs incurred by the Fund in such action in court or arbitration, including arbitration fees, interest, auditors' fees,

attorneys' fees and costs, court costs (including filing fees and service of process costs), incurred by the Fund in the collection of the Employer's Contributions or other payments.  The Employer (or other individual or entity) shall also be liable to the Fund for: interest at the rate of one percent (1%) per month or part thereof (or at such other rate as the Trustees may from time to time determine), and liquidated damages at an amount equal to the greater of interest on the delinquent Contributions or twenty percent (20%) of the delinquent Contributions.

c.   In the event this Agreement is terminated or the Trustees of the Fund determine, in their sole discretion, that the Employer has withdrawn from the Fund pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Fund may invoke the procedures provided in the Trust Agreement and ERISA for the assessment and collection of withdrawal liability.

4.   Arbitration.

a.   Any controversy, claim, complaint, grievance or dispute arising out of or relating to the provisions of this Agreement or the interpretation, breach, repudiation application or performance thereof, may be submitted by the Fund (at the discretion of the Fund's Trustees or the Fund Administrator) or the Employer to final and binding arbitration in a proceeding in New York City, New York.  Dr. Phillip Ross, or his designee, is designated as the arbitrator under this Agreement.  In the event of the unavailability of Dr. Phillip Ross, or his designee, a successor arbitrator shall be appointed in writing by the Employer and the Fund.  In the event they cannot agree upon a successor, the arbitrator shall be appointed forthwith by the American Arbitration Association upon application of the Fund or the Employer.

Arbitration under this Paragraph 4(b) shall be conducted in accordance with the Multiemployer Pension Plan Arbitration (MEPPA) Rules for Withdrawal Liability Disputes of the American Arbitration Association.
The arbitrator's award in an arbitration under this Paragraph 4 shall be final and binding upon the parties hereto, and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States or country or application may be made to such court for a judicial acceptance of the award and an enforcement as the law of such jurisdiction may require or allow.  Each party shall bear its own cost, including attorneys' fees, of the arbitration.
Nothing contained herein shall be deemed to prohibit the arbitrator from awarding interest to the prevailing party if the arbitrator deems it to be justified and appropriate.

69

IN WITNESS HEREOF, the parties hereto have caused this Supplemental Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**SIX FLAGS GREAT ADVENTURE AND WILD SAFARI**                    **UNITE HERE Union Local 54**

_____          _____
By:                                       By:
Title:                                    Title:


                                          **UNITE HERE Union Local 54**


                                          _____
                                          By:
                                          Title:


                                          **——————————————————————**
                                          **National Retirement Fund**
                                          By:
                                          Alicare,Inc.


                                          _____
                                          By: Richard Rust
                                          Title: Fund Manager

**(18)**

# ADDENDUM L
# UNITEHERE LOCAL 54

## 401(K) Plan

Upon receipt of a copy of a current determination letter from the Internal Revenue Service stating that the National Plus Plan (the "Union 401(k) Plan") meets the requirements for qualification under Section 401(a) of the Internal Revenue Code, the Employer will begin withholding the amount designated as an elective contribution to the Union 401(k) Plan.  Such designation must be properly made by an employee on the salary reduction authorization and election form supplied by the Union 401(k) Plan for this purpose.  Neither the Employer nor the Union shall have any obligation to make any contributions to the Union 401(k) Plan (including, but not limited to, non-elective or matching contributions).

The form and operation of the Union 401(k) Plan *shall* comply with the provisions of applicable law (including the Internal Revenue Code and ERISA), *including* compliance with the fiduciary responsibility and reporting and disclosure provisions of ERISA and the Internal Revenue Code.

The sole involvement of the Employer with the Union 401(k) Plan, and the only obligations of the Employer hereunder, shall be to withhold the designated contributions from employee's wages on a pre-tax basis, to transmit such contributions (along with required reports) to the Trustees of the Union 401(k) Plan, to report such contributions on an employee's W-2 form, and to provide such information and reports as are required from the Employer by the Union 401(k) Plan to facilitate discrimination testing and qualification of the Plan.  The Employer shall not be required to pay, nor shall the Employer have any obligation or responsibility for, any liability, cost or expense relating to the Union 401(k) Plan, other than such obligations set forth in the preceding sentence.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands this _____ day of _____, 2017.

**SIX FLAGS GREAT ADVENTURE)**        **UNITE HERE LOCAL 54**

By: _____     By:_____

Date: _____        Date: _____

**ADDENDUM L (CONTINUED)**
## (18 A)      UNITEHERE LOCAL 54
PARTICIPATION AGREEMENT (CONTINUED)
**NATIONAL PLUS PLAN**

The Employer shall become a participating Employer in the  National Plus Plan (hereinafter called the "Plan") effective _____.  The Employer agrees to be bound by the Agreement and Declaration of Trust of the National Plus Plan as may be amended from time to time.  The Employer further agrees and consents to the Employer-designated Trustees of the said Fund to serve as such in accordance with the aforesaid Agreement and Declaration of Trust.

The Employer agrees to forward to the Fund on behalf of each participating employee covered by the Collective Bargaining Agreement, before the tenth of each month, for all payroll weeks ending in the prior calendar month, employee contributions made in accordance with the following language.

Each participating employee may contribute to the National Plus Plan on a voluntary payroll deduction and such deductions will be made based on one of the following methods.

(   ) dollars per week (before taxes & Roth □ or before tax only □ )

(   ) cents per hour (before taxes & Roth □ or before tax only □ )

(   ) percentage of pay (before taxes & Roth □ or before tax only □ )

All contributions shall be made payable to the National Plus Plan of the National Plus Plan and shall be remitted to the office of the Fund.

The Employer shall submit monthly, a list showing the names and Social Security numbers of all employees, the amount contributed per employee, and the resulting contributions due.  If contributions are made on a cents per hour basis, hours compensated must also be reported (the "Contribution Report").

The Trustees may at any time have an audit made of the Employer's payroll and wage records and other relevant financial records of the Employer in connection with the said contributions and/or reports.

In addition to any other remedies to which the Fund may be entitled, if the Employer is delinquent for one or more months, The Employer shall pay interest, retroactive to the due date, at the rate the Trustees require on monies due the Fund, from the date when the payment was due to the date when payment is received by the Fund, the greater of 20% of liquidated damages on the delinquent amount or double interest, and all expenses of collection, including, but not limited to, legal fees.

In addition to any other remedies to which the Fund may be entitled, if the Employer is delinquent for one or more months in submitting a Contribution Report to the Fund, the Employer shall pay interest on unreported contributions, retroactively to the due date of such reports, at the rate the Trustees require on monies due the Fund, from the date when the

Contribution Report was due to the date when the Contribution Report is received by the Fund, the greater of 20% of liquidated damages on the unreported contributions or double interest, and all expenses of collection, including, but not limited to, legal fees.

The Employer shall provide to the National Plus Plan, on a timely basis, information the National Plus Plan reasonably requests for the purpose of conducting non-discrimination testing for the National Plus Plan.


_____          _____

SIX FLAGS GREAT ADVENTURE                 Date


_____          _____

UNITE HERE LOCAL 54                       Date


_____          _____

UNITE HERE LOCAL 54                       Date

**(19)**

# ADDENDUM M
## UNITEHERE LOCAL 54
## UNITE HERE INTERNATIONAL UNION TIP

The Employer agrees to honor political contribution deduction authorization from its employees in the following form:

I hereby authorize the Employer to deduct from my pay the sum of $1.00 per month and to forward that amount to the UNITE HERE International Union TIP - "To Insure Progress". This authorization is signed voluntarily and with the understanding that the UNITE HERE Tip Campaign Committee International Union TIP - "to Insure Progress" will use this money to make political contributions and expenditures in connection with Federal elections. I am aware of my right to refuse to sign this authorization without reprisal. This authorization may be revoked by mailing notices of revocation by United States Registered or Certified Mail, Return Receipt Requested, to the Treasurer, UNITE HERE TIP Campaign Committee International Union TIP - "To Insure Progress", 275 7th Avenue, New York, NY 10001 and to the Employer.

The political contribution deduction shall be made once each month during which an employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within thirty (30) days after the last day of the preceding month to the UNITE HERE TIP Campaign Committee International Union TIP - "To Insure Progress",
275 7th Avenue, New York, NY 10001, accompanied by a form stating the name and Social Security number of each employee for whom a deduction has been made, and the amount deducted.

The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits or other terms of liability that shall arise out of or by reason of action taken by the Employer in reliance upon payroll deduction authorization cards submitted to the Employer.

Accepted and Agreed by:     Accepted and Agreed by:
SIX FLAGS GREAT ADVENTURE   UNITE HERE LOCAL 54

_____  _____

_____  _____

_____   _____
Date         Date

## ADDENDUM N

## 20) TEAMSTERS PENSION REHABILITATION AGREEMENT
### Teamsters Local Union No. 469 Pension Fund Rehabilitation Plan

The Pension Fund adopted a Rehabilitation Plan in compliance with the Pension Protection Act effective for Plan Year 2008 and thereafter. "In accordance with the Rehabilitation Plan by the Teamsters Local Union No. 469 Board of Trustees.  Employers were required to make a contribution of $0.50 per hour effective May 1, 2008, $0.50 effective May 1, 2009, $0.50 effective 2010, $0.00 effective 2011, $0.60 effective 2012. The Company started making these contributions as follows, 2009 $1.00, 2010 $1.50 and another increase in 2013 to $2.10. The contribution amount of ($2.10) would not be subject to pension accruals on behalf of the participants." This will be paid up to a maximum of 173 hours per calendar month. All future contribution shall come from the total wage package.

IN WITNESS THEREOF, the parties have agreed to the above mentioned and have set their hands and seals of this Agreement.

_____          _____
Sam Rubino                                              Date
SERVICE TRADES COUNCIL

_____          _____
TEAMSTERS Local Union No. 469                          Date

_____          _____
Neal Thurman                                           Date
SIX FLAGS GREAT ADVENTURE

## LIST OF ADDENDUMS AND SIDE AGREEMENTS FOR LOCAL 54

**1)**   ADDENDUM A: UNITEHERE <u>LOCAL 54:</u> CONCESSIONAIRES AGREEMENT

**4)**   ADDENDUM C-1: UNITEHERE <u>LOCAL 54</u>: LOCAL 54 FULL-TIME:
HOURLY RATE OF COMPENSATION

**5)**   ADDENDUM C-2: UNITEHERE <u>LOCAL 54</u>: LOCAL 54 SEASONAL

**6)**   ADDENDUM D: UNITEHERE <u>LOCAL 54</u>: <u>LOCAL 54 BENEFIT FUNDS AGREEMENT</u>

**7)**   EXHIBIT 1: UNITEHERE <u>LOCAL 54</u>: WAIVER OF HEALTH AND WELFARE
COVERAGE

**8)**   ADDENDUM E; UNITEHERE <u>LOCAL 54</u> and SERVICE <u>TRADES</u>: SIX FLAGS GREAT
ADVENTURE DRUG AND ALCOHOL TESTING POLICY

**9)**   ADDENDUM F: SERVICE TRADES COUNCIL AFFILIATE BENEFIT <u>FUNDS</u>

**12)**   ADDENDUM H: UNITEHERE LOCAL 54: <u>LOCAL 54</u> GRIEVANCE FORM AND
PROCEDURES.

**14)**   ADDENDUM I (2) CONCESSIONAIRES SIDE LETTER: UNITEHERE <u>LOCAL 54</u>

**16)**   ADDENDUM J: UNITEHERE <u>LOCAL 54:</u>
PAYROLL DEDUCTION FOR SUPPLEMENTAL INSURANCE

**17)**   ADDENDUM K: SUPPLEMENTAL AGREEMENT UNITE HERE NATIONAL
RETIREMENT FUND: <u>LOCAL 54</u>

**18)**   ADDENDUM L PARTICIPATION AGREEMENT NATIONAL PLUS PLAN 401 K PLAN
<u>LOCAL 54</u>

**19)**   ADDENDUM M UNITE HERE INTERNATIONAL UNION TIP <u>LOCAL 54</u>

## <u>LIST OF ADDENDUMS AND SIDE AGREEMENTS FOR TRADES</u>

**2)** ADDENDUM B-1: FULL-TIME MAINTENANCE: SERVICE <u>TRADES.</u>

**3)** ADDENDUM B-2 and B-3: SEASONAL WAREHOUSE: (<u>TEAMSTER</u>) EMPLOYEES

**8)** ADDENDUM E; UNITEHERE <u>LOCAL 54</u> and SERVICE <u>TRADES</u>: SIX FLAGS GREAT ADVENTURE DRUG AND ALCOHOL TESTING POLICY

**9)** ADDENDUM F: SERVICE TRADES COUNCIL AFFILIATE BENEFIT <u>FUNDS</u>

**10)** ADDENDUM G: SERVICE <u>TRADES</u>: NEW CONSTRUCTION PROJECT LABOR AGREEMENT

**11)** EXHIBIT G -- LETTER OF ASSENT: SERVICE <u>TRADES</u>

**13)** ADDENDUM I (1) SIDE LETTER OF INTERPRETATION: SERVICE <u>TRADES</u>: SUBCONTRACTING ISSUES.

**15)** ADDENDUM I (3) SIDE LETTER: RE: USING COMPOSITE CREW UNDER LIMITED CIRCUMSTANCES: SERVICE <u>TRADES.</u>

**20)** ADDENDUM N TEAMSTERS PENSION REHABILITATION AGREEMENT